# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| **SILICONE GEL BREAST IMPLANT** | } | **Master File No.: 2:92-CV-10000-RDP** |
| **PRODUCTS LIABILITY LITIGATION** | } | |
| **(MDL 926)** | } | |
| | | |
| **SANDY ALTRICHTER, et al., on behalf** | } | |
| **of themselves and all others similarly** | } | |
| **situated,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:97-CV-11441-RDP** |
| | } | |
| **INAMED CORPORATION, et al.** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants' Motion for Order to Show Cause (Doc. #208), filed September 20, 2006.  For the reasons that follow, Defendants' Motion is due to be granted in part and denied in part, and Class Member Zuzanna Juris's request to be excluded from the Inamed Class Settlement is due to be denied.

## I.      FACTUAL AND PROCEDURAL HISTORY

Well after the creation of the first silicone breast implants, women who received them began to assert claims alleging that leaking gel caused various diseases.  Before long there were a number of lawsuits.  In January 1992, the Food and Drug Administration banned the use of silicone gel implants, and a "tidal wave of litigation" followed.  MARCIA ANGELL, SCIENCE ON TRIAL: THE CLASH OF MEDICAL EVIDENCE AND THE LAW IN THE BREAST IMPLANT CASE 69 (1996).  In April

1992, the FDA relaxed the ban to permit use of implants for certain medical purposes – *e.g.*, reconstruction after mastectomy, correction of congenital deformities, or replacement of ruptured implants.  The wave of lawsuits just increased all the more.

In mid-1992 the Judicial Panel on Multidistrict Litigation ("MDL Panel") determined that the number of breast implant cases pending in the federal courts required consolidation of those cases for pretrial proceedings.  *In re Silicone Gel Breast Implants Products Liability Litigation*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992).  But the question of whether to centralize the actions against the defendants was the easy one.  The overwhelming number of positions received by the MDL Panel supported transfer to an MDL court.  *Id.* at 1099.  The more contested issue was which court should be named the transferee court.  The parties who supported transfer took different positions on that question.  A number argued that the cases should be transferred to the Northern District of California where a number of the manufacturers were located and California was presumptively the home of the largest number of actual and potential claimants in the breast implant litigation.  *Id.* at 1100.  Still another group favored the Southern District of Ohio where the presiding district judge had already conditionally certified a nationwide opt out class, established a document depository, and scheduled a trial on common issues for the next calendar year.  *Id.*

In analyzing these differing positions, the Panel observed:

> that either the Northern District of California or the Southern District of Ohio could be an appropriate forum for this docket and certainly the judges referred to are experienced and well-qualified to handle this litigation.  We are troubled, however, by the volume and tone of the negative arguments with which opposing counsel have sought to denigrate each other's forum choices, litigation strategies and underlying motives.  A brief recitation of a few of these arguments sufficiently coveys their flavor.  For example, various parties argue that 1) parties in the Ohio forum have engendered a flurry of pretrial

2

> activity in an effort to dictate our decision on selection of the
> transferee court; 2) the class in the Southern District of Ohio
> was certified in a precipitous fashion, without according adequate notice
> or opportunity to be heard to interested parties nationwide; 3)
> defendants oppose the California forum only because two trials there
> resulted in substantial verdicts against one of them; and 4) the
> plaintiffs who favor the California forum are forum shopping for a
> judge who had tried a breast implant action in which plaintiffs
> prevailed.

*Id.* at 1100. These arguments, which were fueled by an acrimonious dispute among counsel, caused the Panel "to look beyond the preferences of the parties in our search for a transferee judge with the ability and temperament to steer this complex litigation on a steady course that will be sensitive to the concerns of all parties." *Id.* at 1101. The Panel settled on Judge Sam C. Pointer, the former Chief Judge of this court, "a former member of [the] Panel, Chairman of the Board of Editors of the Manual for Complex Litigation, Chairman of the Judicial Conference's Advisory Committee on Civil Rules, and an experienced multidistrict transferee judge." *Id.* It was a good thing that the Panel entrusted "this important and challenging assignment to [such] a distinguished jurist." *Id.* Eventually, over 21,000 cases were transferred to this court.

Accordingly, on June 25, 1992, the Panel transferred the federal breast implant litigation to this court for the purpose of consolidated pretrial proceedings. *Id.* The consolidated cases proceeded under the heading *In re Silicone Breast Implant Products Liability Litigation*, MDL 926, 2:92-CV-10000. Included in the transfer were all pending lawsuits filed in federal court against Inamed for allegedly defective breast implants.

The Inamed breast implant litigation reached its crescendo in 1999 when Judge Pointer certified a mandatory limited fund class for settlement purposes only. The settlement extinguished all current and future breast implant related claims against Inamed. Zuzanna Juris, a class member,

now, over a decade later, requests exclusion from this settlement.  An analysis of her arguments for exclusion first requires a careful appreciation of the events precipitating Judge Pointer's decision to certify the class and approve the settlement.

## A.    Inamed's Pre-Settlement Financial Position

In 1991, women who received Inamed or Inamed-subsidiary breast implants began filing individual lawsuits against the company and its subsidiaries.  (Doc. #269-2, Babbit Aff. ¶ 12).  The litigation quickly ballooned until approximately 15,000 lawsuits had been filed across the country.  (Doc. #269-2, Babbit Aff. ¶ 12).  As a result, the breast implant litigation forced Inamed to divert a significant portion of its capital to funding its defense efforts.  (Doc. #269-2, Babbit Aff. ¶ 14).  In 1994, attempting to stem the tide, Inamed and the plaintiffs' settlement committee negotiated a global settlement agreement, which required Inamed to pay $1 million per year for 25 years.  (Doc. #269-2, Babbit Aff. ¶ 16 n.1; Babbit Aff. Ex. C).  In anticipation of the settlement's approval, Inamed booked the $25 million annuity as a $9.2 million contingent liability.[1]  (Doc. #269-2, Babbit Aff. ¶ 16 n.1).  Inamed proposed certifying the class pursuant to Rule 23(b)(1)(B),[2] thereby securing a mandatory, global resolution of all present and future claims.  (Doc. #269-6, 1/11/99 Hearing Transcript 11:13-17).  Plaintiffs' settlement committee retained Ernst & Young to review the financial statements of Inamed and to determine whether limited fund treatment was appropriate.  (Doc. #269-2, Babbit Aff. ¶ 29).  Having reviewed Inamed's financial statements, Ernst & Young issued a report, which concurred with Inamed's assessment that its liabilities, both operational and

---

[1]This $9.2 million figure reflected the present value of twenty-five annual payments of $1 million.

[2]Since this time period when the parties analyzed the issues and Judge Pointer entered his orders, Federal Rule of Civil Procedure 23 has undergone several cosmetic and substantive revisions.  To the extent that one of Rule 23's provisions, relevant to this litigation, was amended, particularly in 2003, the distinction is acknowledged.  If unacknowledged, however, Rule 23, as it appeared in the mid- to late-1990s, is identical to its present iteration.

litigation-related, dwarfed its assets.  (Doc. #269-2, Babbit Aff. ¶ 29).  On this basis, plaintiffs' counsel did not contest the propriety of Rule 23(b)(1)(B) class treatment; instead, they questioned whether the $9.2 million present value contribution was prudent considering Inamed's future earnings potential.  (Doc. #269-2, Babbit Aff. ¶ 29).  The disagreement yielded further settlement negotiations between Inamed and plaintiffs' counsel, and the possibility of global settlement languished.  (Doc. #269-2, Babbit Aff. ¶ 29).

In 1996, and responding to deepening financial troubles, Inamed approached a high risk investment group and raised $35 million through a private placement of senior secured convertible notes.  (Doc. #269-2, Babbit Aff. ¶ 17).  The notes were senior to all claims (including operational liabilities and tort claims) and were secured by interests in substantially all of Inamed's assets, "including all inventory, equipment, accounts receivable and stock of subsidiaries."  (Doc. #269-2, Babbit Aff. ¶ 17).  Under the terms of the offering, Inamed placed $15 million in escrow for the sole purpose of financing a mandatory non-opt-out settlement class fund if approved by January 23, 1997. (Doc. #269-2, Babbit Aff. ¶ 17).  As that condition was not met, Inamed returned the $15 million to the noteholders in exchange for warrants to purchase Inamed common stock if a mandatory class settlement was later approved.  (Doc. #269-2, Babbit Aff. ¶ 17).  The balance – $20 million – was earmarked for covering operational expenses and paying down the company's debt load.  (Doc. #269-2, Babbit Aff. ¶ 17).  Inamed quickly exhausted the $20 million.  (Doc. #269-2, Babbit Aff. ¶ 17).

In January 1997, Inamed secured $6.2 million from another private debt placement.  (Doc. #269-2, Babbit Aff. ¶ 18).  All proceeds from the offering were immediately spent on day-to-day operational expenses as well as paying past-due federal and state income tax liabilities.  (Doc. #269-2, Babbit Aff. ¶ 18).  During this same time period, Inamed defaulted on its repayment obligations

5

under the senior secured notes. (Doc. #269-2, Babbit Aff. ¶ 18). The company explored other options of raising capital. (Doc. #269-2, Babbit Aff. ¶ 18). However, between (1) the senior secured noteholders exercising their veto authority over Inamed's ability to raise capital through equity offerings and (2) the simple unavailability of commercially reasonable lending opportunities given the company's dire financial predicament, Inamed's only option was to obtain $10 million from an entity related to the company's former chairman. (Doc. #269-2, Babbit Aff. ¶ 19).

Since the early 1990s and to 1997, each audit letter, prepared by Coopers & Lybrand for the relevant SEC filings, included a qualified opinion. (Doc. #269-2, Babbit Aff. ¶ 26). That qualified opinion expressed "substantial doubt about the Company's ability to continue as a going concern." (Doc. #269-2, Babbit Aff. ¶ 26). For fiscal years 1995, 1996, and 1997, Inamed reported pre-tax operating losses of $8.6 million, $6.0 million, and $6.6 million, respectively. (Doc. #269-2, Babbit Aff. ¶ 16). At year end 1997, the company's consolidated book value (*i.e.*, subtracting liabilities from assets) was negative $10.9 million.[3] (Doc. #269-2, Babbit Aff. ¶ 16). Adding back the $9.2 million contingent liability, booked in 1994 in anticipation of the proposed settlement, the company's book value was still negative $1.7 million. (Doc. #269-2, Babbit Aff. ¶ 16). Aside from the $9.2 million contingent liability,[4] Inamed had not accounted on its balance sheet for any other litigation

---

[3] At the hearing on January 11, 1999, Ernest Hornsby questioned Class Counsel's retained financial expert, Alan Jacobs of Ernst & Young, regarding the appropriate method of business valuation. (Doc. #269-6, 1/11/99 Hearing Transcript 38-39). Specifically, Hornsby asked Jacobs whether the book value method or the market capitalization method was more appropriate for valuing Inamed. (Doc. #269-6, 1/11/99 Hearing Transcript 38:11-14). Jacobs noted that, although the market capitalization method had been considered, which may have yielded a higher business value, the book value method, based on the circumstances, was the better avenue for appraisal. (Doc. #269-6, 1/11/99 Hearing Transcript 38:15-24). In any event, Jacobs concluded that, whether market capitalization or book value was applied, the settlement proposed and ultimately approved was fair, adequate, and reasonable in light of Inamed's financial position. (Doc. #269-6, 1/11/99 Hearing Transcript 38:25-39:3).

[4] Critically, by 1997, the 1994 proposed settlement, which called for a $1 million annuity over a 25 year period, was no longer a possible solution given the company's continued decline and monthly negative cash flow. Thus, to the extent that Inamed's balance sheet reflected the costs of litigation, the entry was without reference to realistic expectations

expenses, including possible settlement, attorneys' fees, and potential judgments.  (Doc. #269-2, Babbit Aff. ¶ 16).  Those expenses, however, were staggering.  For example, the cost for Inamed's attorneys to take a single case from beginning through trial was $300,000.  (Doc. #269-3, Rawls Aff. ¶ 10).  The legal fees and costs associated with taking a single case to the brink of trial were $150,000.  (Doc. #269-3, Rawls Aff. ¶ 10).  Additionally, in 1997 alone, Inamed settled sixteen cases, and the settlements ranged from $2,500 to $50,000 and averaged $18,500 per case.  (Doc. #269-3, Rawls Aff. ¶ 13).  The values of these settlements reflected the actual payout to plaintiffs without incorporating the transactional costs required to reach them.  (Doc. #269-3, Rawls Aff. ¶ 13).  During the relevant time period, neither Inamed nor its subsidiaries had products liability insurance coverage.  (Doc. #269-3, Rawls Aff. ¶ 14).

In light of Inamed's rapidly deteriorating financial condition, the company and plaintiffs' counsel revisited settlement negotiations during the latter part of 1997.  (Doc. #269-4, Jacobs Aff. ¶ 15).  At this stage, however, investors were unwilling to finance a settlement that "did not extinguish all, or substantially all, of the company's breast implant litigation.  Investors . . . saw elimination of the huge costs and risks of the implant litigation as an essential precondition to the economic turnaround necessary to repay such an investment."  (Doc. #269-2, Babbit Aff. ¶ 37).  Coupling this pressure with the senior secured noteholders' authority over Inamed's financing decisions, "Inamed's ability to pay for any settlement was . . . essentially dependent on the willingness of its senior secured noteholders to finance it."  (Doc. #269-2, Babbit Aff. ¶ 38).

During the negotiations, the settlement participants considered the bankruptcy option.  In terms of bankruptcy possibilities, Chapter 7 liquidation, as opposed to Chapter 11 reorganization,

---

or actual costs.

7

was the only viable solution to Inamed's financial stresses.  (Doc. #269-2, Babbit Aff. ¶¶ 47-51).  If Inamed, at 1997 year end, had elected Chapter 7 bankruptcy, the company's saleable assets, discounted by the impairment likely to result from a forced liquidation, totaled between $11.4 million and $20.4 million. (Doc. #269-2, Babbit Aff. ¶ 46).  The senior secured creditors would have been entitled to $19 million, which would have left unsecured creditors (trade creditors as well as tort claimants) with anywhere between $0 and $1.4 million.  (Doc. #269-2, Babbit Aff. ¶ 46).  During the course of bankruptcy, tort claimants would have had to contend with trade creditors, with rights to payment valued at $12.5 million, and unsecured noteholders, with rights to payment valued at $10 million.  (Doc. #269-2, Babbit Aff. ¶ 46).

Counsel for Plaintiffs with current injury claims as well as counsel for Plaintiffs with potential injury claims participated in the settlement negotiations with Inamed and Inamed's senior secured noteholders.  (Doc. #269-5, Decl. of Class Counsel ¶¶ 5-6; Doc. #269-2, Babbit Aff. ¶ 39).  The senior secured noteholders, the only lenders open to advancing Inamed funds for settlement, conditioned their willingness to finance on (1) the settlement being mandatory and (2) the settlement value not exceeding $31.5 million.  (Doc. #269-2, Babbit Aff. ¶¶ 37, 39).  If Plaintiffs demanded opt-out rights or money beyond $31.5 million, Inamed, steered by the senior secured creditors, was prepared to pursue liquidation.   "Thus, the proposed certification of a mandatory settlement class . . . [made] possible the creation of a substantial fund . . . that would otherwise not exist."  (Doc. #269-2, Babbit Aff. ¶ 37).

Acknowledging Inamed's financial reality – that unconstrained litigation would force Inamed to seek bankruptcy protection and, thus, subordinate tort claims to the senior secured noteholders – Plaintiffs' counsel begrudgingly accepted the comparative benefit of limited fund treatment.  (Doc.

8

#269-5, Decl. of Class Counsel ¶¶ 9-10).  Eventually, all parties participating in the settlement

negotiations accepted the $31.5 million limited fund, obtained by Inamed from its senior secured

noteholders, as the only available resolution.  In particular, Plaintiffs' counsel, including counsel

representing future injury claimants, concluded "that all Inamed implant claimants, whether their

injuries were manifest or not, had a common interest in securing a common fund, at this time, as a

certain source of recovery for their claims, and that none of them would be well served by the

alternatives of default, insolvency and bankruptcy."  (Doc. #269-5, Decl. of Class Counsel ¶ 6).[5]

**B.**     **1998 Notice of the Proposed Limited Fund Settlement Class**

The parties presented to Judge Pointer a proposed settlement, which called for mandatory

class certification of a $31.5 million limited fund.  On June 2, 1998, the court provisionally certified

a mandatory class and conditionally approved the proposed settlement.  (Doc. #10).  On June 2,

1998, the court entered Order 47, which directed notice to be given to all potentially affected by the

class settlement.  (Doc. #10, Order 47; Doc. #269-6, 1/11/99 Hearing Transcript 3:16-19).  In

fashioning the plan for giving notice of the proposed settlement, Judge Pointer attempted to

approximate the level and quality of notice required by Rule 23(b)(3) even though the class was

---

[5]To be clear, the $31.5 million financing was a loan – the senior creditors did not gratuitously advance this money.  (Doc. #269-2, Babbitt Aff. ¶ 41; Doc. #59, Order 47A ¶ 5(b)).

provisionally certified pursuant to Rule 23(b)(1)(B).[6]  (Doc. #269-6, 1/11/99 Hearing Transcript 7:18-8:1).

First, the court directed notice to be sent to all individuals registered with the Claims Office. (Doc. #269-6, 1/11/99 Hearing Transcript 3:19-24).  At that point in time, approximately 250,000 women had registered with the Claims Office.  (Doc. #269-6, 1/11/99 Hearing Transcript 4:8-12). The court estimated that around 80,000 of the registered claimants were potential members of the Inamed Settlement Class.  (Doc. #269-6, 1/11/99 Hearing Transcript 4:16-19).  Supplementing the individually-mailed notices, the court required sending notice to approximately 28,000 attorneys who represented plaintiffs with breast implant-related claims against Inamed.  (Doc. #269-6, 1/11/99 Hearing Transcript 4:12-15).

The court, however, understood that not all women with Inamed implants would have registered with the Claims Office or would have retained counsel subject to the mass mailing.  It was from this understanding that the court ordered notice of the proposed settlement to be published in two periodicals.  (Doc. #269-6, 1/11/99 Hearing Transcript 4:22-5:3).  Class counsel retained Hilsoft

---

[6]At the time Judge Pointer supervised the notification plan, Rule 23 set forth the following notice guideline if the court certified the class pursuant to Rule 23(b)(3):

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

FED. R. CIV. P. 23(c)(2) (1998).  In 2003, Rule 23(c)(2) was amended to identify the following details that must be included for adequate notice in the context of a Rule 23(b)(3) class certification: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23( c)(3)." FED. R. CIV. P. 23(c)(2) (2009).

Notifications to design and to implement publication notice of the class settlement. (Doc. #269-12, Hilsee Aff. ¶ 1). The court approved the text of the notice, and Hilsoft Notifications designed the layout and selected the appropriate magazines. (Doc. #269-12, Hilsee Aff. ¶ 2). Hilsoft Notifications placed the notices in the October 28, 1998 edition of *USA Today* and the October 30, 1998 edition of *People Magazine*. (Doc. #269-12, Hilsee Aff. ¶ 2). Based on available data at the time, the total female readership of *USA Today* was 1,460,000, and the total female readership of *People Magazine* was 25,181,000. (Doc. #269-12, Hilsee Aff. ¶ 3). Together, the publications reached an estimated 26,641,000 females. (Doc. #269-12, Hilsee Aff. ¶ 3).

In addition to the *USA Today* and *People Magazine* notices, another notice, approved by Judge Pointer, was placed in the December 7, 1998 edition of *Modern Healthcare Magazine*, with a total readership of 76,482. (Doc. #269-13, Klausner Aff. ¶¶ 3-4). The notice contained in the magazine was also posted to the magazine's website from November 23, 1998 until December 7, 1998. (Doc. #269-13, Klausner Aff. ¶ 4). Finally, Judge Pointer placed notice of the settlement and request for objections on the website supervised by the court. (Doc. #269-6, 1/11/99 Hearing Transcript 5:7-10).[7] This notice appeared from October 1998 until January 1999. (Doc. #269-6, 1/11/99 Hearing Transcript 5:7-10).

The notices, distributed through various media noted above, each contained the following details: (1) the Northern District of Alabama had preliminarily certified and approved a $31.5 million mandatory class settlement against Inamed and its subsidiaries; (2) if approved, the mandatory class settlement would extinguish all legal claims, filed or otherwise, against Inamed by women who

---

[7]The online notice remains available. Breast Implant Litigation Notice, http://www.fjc.gov/BREIMLIT/ ORDERS/ notice47.htm (last visited April 28, 2010).

received the company's implants prior to June 1, 1993; (3) certification and settlement objections

must be postmarked no later than December 11, 1998; (4) a copy of the proposed settlement was

available for free via mail, fax, or the Internet; and (5) the court had set a hearing on final

certification and approval on January 11, 1999 at the Federal Courthouse in Birmingham, Alabama.

**C.    Hearing Regarding Certification of the Inamed Settlement Class**

On January 11, 1999, Judge Pointer held a hearing to consider the propriety of class

certification and settlement approval.  (Doc. #269-6, 1/11/99 Hearing Transcript 1).  At the hearing,

Judge Pointer, along with a member of the class's negotiation committee, Leslie Bryan, agreed that,

to the extent that a conflict could arise between current and future claimants, that conflict was

relevant only to the plan of distribution – not the decision to certify the limited fund class:

> THE COURT:    Well, I can certainly foresee that if the
> limited-fund settlement is approved, that is
> this stage, and let's say there is no appeal, that
> when you come to the second phase of
> determining how to most equitably distribute
> that amount, you could at that point have
> potential conflicts as between someone who
> already has an injury, perhaps even has a
> lawsuit, and someone who hasn't had any kind
> of injury and no lawsuit.  That conflict could
> arise at that point.
>
> MS. BRYAN:    Yes, sir.
>
> THE COURT:    But I am not sure that there is any conflict at
> this point as between those two groups in
> terms of whether it's better to have 31.5
> million rather than to have zero.
>
> MS. BRYAN:    That's correct, Your Honor.  And frankly,
> that's the reason that we approached this
> settlement the way that we did.  Our goal was
> to maximize the pot of money that could be

available to all claimants without being concerned about how the distribution mechanism would come about. We were convinced that this was the maximum amount of money that could be available.

. . . .

THE COURT: But if that conflict were to develop as between people with present injuries, people and perhaps present lawsuits or have already received 80 percent but are still looking for 20 percent, which has already been determined, versus those who have not had any injury, no lawsuit at all, that presumably, that conflict or resolution of that would come not at this stage but at a subsequent stage and indeed could produce hearings or appeals at that point. But at that time you would at least know you had money to deal with rather than not having anything to deal with.

MS. BRYAN: Yes, sir. That's certainly been our perspective.

(Doc. #269-6, 1/11/99 Hearing Transcript 46:22-48:12). To be sure that this conclusion represented

the interests of potential future claimants, Judge Pointer questioned another member of the plaintiffs'

negotiation committee, Elizabeth J. Cabraser, regarding the composition of the class representatives:

THE COURT: Well, do you have . . . a class representative who has no manifested injury?

MS. CABRASER: We have class representatives with no manifested injury, we have class representatives with what could be considered minor to moderate injuries, and we have at least one class representative . . . who is disabled, totally disabled, very seriously injured.

13

(Doc. #269-6, 1/11/99 Hearing Transcript 59:4-12).  Finally, in light of these concerns, Judge Pointer

acknowledged the potential utility of sub-classing during the second phase[8] of the settlement

approval process.

> THE COURT:     Well, you might have to have some subgrouping at a time of determining a plan of distribution.  There is certainly the potential for conflict or competition at that point.  But I take it the position is at this stage, in terms of whether to have 31 and a half million or have zero, you don't see a conflict between any of the group?

> MS. CABRASER:     No, we don't, Your Honor.  We believed everone [sic] in this class, regardless of the degree of injury or whether injury is manifested or unmanifested, has an overriding community of interest in obtaining as much as possible as soon as possible to come under the control of the Court for the benefit of the class.  If it's necessary to designate formal sub-classes or subgroups at a future time, that could be done, we believe, using the present representatives, or the Court always has the power to designate additional representatives.

(Doc. #269-6, 1/11/99 Hearing Transcript 60:13-61:4).

Additionally, Judge Pointer heard objections from others potentially affected by the class

settlement.  For example, Jennifer Chism, who had not yet manifested any injury, filed an objection

and appeared at the hearing.  Chism's first objection concerned the proposal's failure to specify a

distribution scheme.  (Doc. #269-6, 1/11/99 Hearing Transcript 99:12-14).  To this objection, Judge

Pointer countered, "I think, as I have tried to explain, it's my view that it is better to look at that

---

[8]At this stage, Judge Pointer was considering only whether to certify a mandatory settlement class pursuant to Rule 23(b)(1)(B), which Inamed would fund with $31.5 million.  A plan for distributing the $31.5 million was not yet under review.

problem only if, in fact, there is a settlement and we have money to distribute.  If there is no money to distribute, the potential for conflicts or for proper distribution in my view would be essentially premature."  (Doc. #269-6, 1/11/99 Hearing Transcript 99:15-20).   Second, Chism likened the settlement proposal to "blackmail" because Inamed, according to Chism, was essentially saying "that 'If you want more money, we are going to file for bankruptcy.'  [Chism did not] want to play that either. [She wanted] everything [Inamed] had."   (Doc. #269-6, 1/11/99 Hearing Transcript 101:12:16).  To this objection, Judge Pointer responded, "One of the problems is everything they have may be zero."  (Doc. #269-6, 1/11/99 Hearing Transcript 101:18-19).  Finally, Chism raised the possibility of opting-out of the settlement class:

> MS. CHISM:       Okay.  Okay.  Last one, the opt-out issues as this mandatory class under section 23(b)(1). I can't opt out, so my right to pursue any future action, since I have had no problems to date, I have no right to pursue after the company – let's just say five years from now.  So I see it as a payoff.  Do I accept the little money that I am going to get now and take it whereas I have no court of action at a later date if something should happen?
>
> THE COURT:       And that's one reason why the argument may very well be made that although you have not had any problems thus far, since you may have problems in the future, then maybe you should get the same amount as someone who has already had problems.  I mean, that's one of the arguments about distribution, that maybe there shouldn't be any distinction in terms of a distribution plan between those that have had problems and those who have not.

(Doc. #269-6, 1/11/99 Hearing Transcript 105:19-106:10).

15

Aside from Chism's objections, Carol Kartagener, attorney for Allison Jo Golden (a potential class member who was suffering from extreme disability), filed objections and appeared on behalf of her client.  Specifically, Kartagener urged the court, if it certified the class and approved the settlement, to "exercise[] its discretion . . . [to] still allow class members to opt out."  (Doc. #269-6, 1/11/99 Hearing Transcript 116:23-25).  Judge Pointer responded:

> THE COURT:          Let me just tell you this.  There is no way that's going to happen.  If I approve this, it's not going to be with any opt-out rights because that's not what is before the Court. There is no way I can do that.  So that's simply not a viable option.

(Doc. #269-6, 1/11/99 Hearing Transcript 117:1-5).[9]

---

[9]The court received several other objections to the proposed course of action.  One objector, Charles Robb, criticized the proposal's release of various parties.  (Doc. #269-6, 1/11/99 Hearing Transcript 84:13-22).  Another objector, Beverly Miller, questioned the interplay between the potential payout and medical care providers.  (Doc. #269-6, 1/11/99 Hearing Transcript 87:23-88:21).  Still another, Amber Ratliffe, questioned whether a payout – as opposed to stock options – was the prudent course.  (1/11/99 Hearing Transcript 94:22-95:5).  Jacquelyn Brown, a registered nurse, appeared, generally lambasted Inamed as a manufacturer of a dangerous product, and suggested that more money should fund the settlement.  (Doc. #269-6, 1/11/99 Hearing Transcript 95:9-97:16).

Various other concerns were presented to Judge Pointer at the hearing through written objections.  In terms of written objections, class members raised the following concerns: (1) the settlement fund was insufficient; (2) future claimants should be entitled to opt out and reserve legal rights; (3) the settlement lacked a predetermined plan of distribution; (4) mandatory class members have a right to opt out under *Phillips Petroleum Co. v. Shutts*, 474 U.S. 797 (1985); (5) notice was inadequate as to future injury claimants; (6) the settlement would violate the Rules Enabling Act; (7) the settlement would improperly sidestep the Bankruptcy Act; (8) whether a limited fund truly existed in light of Inamed's slight economic turnaround as a result of Judge Pointer provisionally certifying a mandatory class action; and (9) whether Judge Pointer should delay consideration in light of the Supreme Court's pending decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  (Doc. #290-5, Resp. of Inamed).  Defendants' counsel responded to each objection.  (Doc. #45).  Class Counsel also responded to these objections.  (Doc. #290-5, Resp. of Inamed).  In addition to the nine topic areas previously mentioned, Class Counsel additionally addressed an objection concerning whether and to what extent the court had jurisdiction – personal or otherwise – to enjoin parallel state court proceedings.  (Doc. #290-6, Resp. of Settlement Class Counsel at 11).

**D.**     **1999 Certification of the Inamed Settlement Class**

**1.**     **Scope of the Inamed Settlement Class**

Despite the objections to the settlement, on February 1, 1999, Judge Pointer entered Order 47A (Doc. #59), which certified a mandatory non-opt-out settlement class[10] related to claims involving complications from Inamed breast implants.  The class's members included "all persons and entities, wherever located, who have or may in the future have any unsatisfied claim (whether filed or unfiled, pending or reduced to judgment, existing or contingent, and specifically including claims for alleged injuries and damages not yet known or manifest) . . . related to, or involving Inamed Breast Implants that were implanted in an operation that occurred before June 1, 1993." (Doc. #59, Order 47A ¶ 2(a)).  In terms of Order 47A's scope, Judge Pointer expansively defined a "settled claim" as

> any and all Breast Implant Related claims . . . whether known or unknown, asserted or unasserted, regardless of legal theory, that are or may be asserted now or in the future by any and/or all Settlement Class Members against any or all of Inamed . . . . "Settled Claims" include, without limitation: (1) any and all claims of personal injury and/or bodily injury, damage, death, emotional or mental harm; (2) any and all claims for alleged economic or other injury or loss or for statutory damages under any state statute; (3) any and all claims for medical monitoring and claims for injunctive or declaratory relief based on, arising out of, or relating to Breast Implants; (4) any and all claims for loss of support, services, consortium, companionship, and/or society by spouses, parents, children, other relatives or "significant others" of persons implanted by with Breast Implants; (5) any and all claims for conspiracy or concert of action; (6) any and all wrongful death or survival actions; and (7) any and all claims for

---

[10]On June 23, 1999, nearly five months after Judge Pointer entered Order 47A, the Supreme Court decided *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which is the Court's most comprehensive treatment of Rule 23(b)(1)(B). After entering Order 47A, Judge Pointer observed that "[u]nlike the situation in *Ortiz* . . ., there cannot be any serious dispute about this being a 'limited' fund case – indeed an extremely 'limited' fund case to the extent of providing what most claimants would view as only '*de minimis*' distributions."  (Doc. #70, Order 47B at 2 n.6).

> punitive or exemplary damages based on or arising out of or related
> to Breast Implants.

(Doc. #59, Order 47A ¶ 2(c)).

Order 47A "conclusively compromised, settled and released" every "settled claim" of each member of the class.  (Doc. #59, Order 47A ¶ 6).  Ensuring global compromise of all claims, pending or otherwise, the Order permanently enjoined all members of the Inamed Settlement Class "from instituting, asserting or prosecuting against Inamed . . . in any pending or future action in any federal or state court, any Settled Claim that the member had, has, or may have in the future."  (Doc. #59, Order 47A ¶ 7).  To protect and effectuate this judgment, Order 47A vested in the United States District Court for the Northern District of Alabama "exclusive and continuing jurisdiction as needed or appropriate to (1) implement, interpret, and enforce the Settlement Agreement, (2) administer, allocate, and distribute the settlement fund, and (3) rule on any applications for costs and expenses incurred in implementing [Order 47A] and the Settlement Agreement."  (Doc. #59, Order 47A ¶ 10).  Order 47A was not appealed.

## 2.      Basis for Certifying the Inamed Settlement Class

According to Judge Pointer, the proposed class satisfied Federal Rule of Civil Procedure 23(a)'s threshold requirements[11] for certification:

> (a)      The members of the Inamed Settlement Class, who are
> reasonably estimated to number in the tens of thousands, are
> so numerous that joinder of all members is impracticable.

---

[11]According to Rule 23(a), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

18

(b)     There are questions of law or fact common to the Inamed Settlement Class, including whether Inamed's breast implant products were defective and unreasonably dangerous, and whether Inamed's conduct, level of knowledge, or resulting duty would give rise to any liability.  No decision on the merits of any of these issues has been made.  In addition, the court finds that class members have common interests in determining whether a limited fund exists, avoiding its diminishment by bankruptcy, and establishing equitable procedures for its distribution.

(c)     The claims of the Representative Plaintiffs are typical of the claims of the Inamed Settlement Class in that they assert the same types of factual and legal liability theories generally asserted by members of the class.  In addition, their request for determination of the existence of a limited fund and the establishment of equitable procedures for its distribution seeks to vindicate a common interest that is independent of any factual differences between their personal claims and those of the class at large.

(d)     The Representative Plaintiffs, who reflect the full spectrum of breast implant claimants ranging from claimants with no manifested injuries to claimants with serious illnesses, and who include both domestic and foreign claimants, will fairly and adequately protect the interests of the Inamed Settlement Class.  The court further finds that Settlement Class Counsel, who have a broad range of experience in both individual and class breast implant litigation, are qualified and competent to provide such representation.   The court finds that at the present stage of the proceedings, there exist no conflicts of interest among the Representative Plaintiffs or Settlement Class Counsel in that all class members share an overriding common interest in the identification and preservation of a limited fund, and the procurement for the class of the maximum available recovery.  In the event divergent interests emerge during later stages of the proceedings, such as proceedings to determine the allocation and distribution of the settlement amount, the court will have the ability in the exercise of the jurisdiction reserved herein to make such further orders or appointments as it deems necessary to ensure that all relevant interests are fairly and adequately represented.

(Doc. #59, Order 47A ¶ 3(a)-(d)).

Judge Pointer certified the class pursuant to Rule 23(b)(1)(B), which authorizes class certification if "prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Based on the evidentiary submissions, Judge Pointer concluded that "the costs and risks of individual breast implant claims greatly exceed Inamed's limited resources, which would soon be exhausted if individual litigation were allowed to continue, and that Inamed therefore constitutes a 'limited fund' against which claims are properly subject to class certification under Rule 23(b)(1)(B)."  (Doc. #59, Order 47A ¶ 4).  He further found that "the settlement fund made available by such certification is substantially greater than the amount, if any, that would be available to pay claims in the absence of such certification." (Doc. #59, Order 47A ¶ 4).

Judge Pointer reached this conclusion despite Inamed's limited financial rebound after having announced the proposed settlement.  Specifically, prior to April 1998, Inamed's stock price hovered around $3 per share, but after the provisional certification, the stock price rose and averaged around $10 per share, which suggested an aggregate market value of approximately $100 million.  (Doc. #290-5, Resp. of Inamed at 11-12).  Objectors argued that, based on SEC financial disclosures as well as the rising stock price, the Inamed Class Settlement was not actually a limited fund because the settlement value was less than Inamed's market capitalization.  (Doc. #290-5, Resp. of Inamed at 10).

To this point, Inamed acknowledged that it had, "during the past six months made progress in implementing a number of the elements of restructuring efforts begun earlier . . . .  This progress include[d] (1) a 10% workforce reduction, the closing of various administrative offices and lines of business, and other cost-cutting measures, (2) improvement of sales and inventory turnover, and (3) reversal of the significant negative cash flow (as much as $2.0 million per month) experienced by the company during the [three years preceding the settlement]."  (Doc. #290-5, Resp. of Inamed at 10).  Nevertheless, Inamed contended that market capitalization would have been an improper method for valuation for two reasons:

> First, stock prices reflect a variety of subjective and objective factors, including expectations about future earnings and cash flow and what risk-taking investors would be willing to pay for them.  In Inamed's case, the current stock price undoubtedly reflects a market expectation that the settlement can be completed according to its terms and that the company will, after paying for the settlement, achieve a measure of relief from the tremendous expense and uncertainty that has arisen since the breast implant litigation began [in] 1992.  Before the proposed settlement was announced, the company's stock price was much lower.  *It is circular to say that the company is not a limited fund because the announcement of a mandatory class settlement caused its stock price to rise.*  As indicated above, such an increase is to be expected, and the improved performance it reflects is essential to obtaining the financing needed to complete any settlement at all.

> Second, a company's stock price in no sense measures its ability to pay.  *There is no buyer willing to pay $100 million for Inamed (especially if the vast backlog of pending cases is not resolved through the proposed settlement)*, and the company has no ability to assess its shareholders for the current trading price of the stock they hold.  *Nor does the company's improved stock price make possible alternative or additional financing.* . . . [T]he company's ability to raise capital is entirely in the control of its senior secured noteholders, who have lent the company $28 million.  The senior debt instruments prohibit Inamed from issuing additional debt or shares of common or preferred stock.  The senior noteholders demanded these

> restrictions, which are typical for high-risk investment situations like the company, in order to ensure that the company could not, without their consent, place their capital at greater risk due to increased leverage, or dilute their potential equity holdings in the event they converted their debt into common stock.

(Doc. #290-5, Resp. of Inamed at 12) (emphasis added).  And in any event, Inamed reinforced the point that it "would [have] been unable to afford any significant settlement absent mandatory class treatment.  The noteholders have insisted on such treatment as a prerequisite to providing the necessary financing, and the relief from litigation brought about by the settlement's preliminary approval has in large measure made possible the progress in the restructuring on which the noteholders have also insisted."  (Doc. #290-5, Resp. of Inamed at 11).  Accordingly, despite the objectors' concerns and in light of Inamed's responses, Judge Pointer concluded that the Inamed Class Settlement presented a sufficiently limited fund to warrant Rule 23(b)(1)(B) treatment.

### 3.  Fairness of the Inamed Class Settlement

Regarding the terms of the compromise, Judge Pointer, pursuant to Rule 23(e),[12] evaluated the settlement for fairness.  Finding that "the settlement was non-collusive and was negotiated in good faith," Judge Pointer found that the settlement passed muster under Rule 23(e) as fair, adequate, and reasonable under the circumstances.  (Doc. #59, Order 47A ¶ 5).  Specifically, $31.5 million was

---

[12]At the time Judge Pointer considered the propriety of the settlement proposal, Rule 23(e) provided that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." FED. R. CIV. P. 23(e) (1998).  In 2003, Rule 23(e) was expanded and now requires that, before a "certified class may be settled, voluntarily dismissed, or compromised," the court must approve the proposed settlement, subject to the following procedures and considerations: "(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.  (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.  (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal. (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.  (5) Any class member may object to the proposal if it requires court approval under subdivision (e); the objection may be withdrawn only with the court's approval." FED. R. CIV. P. 23(e) (2009).

available to Inamed through various lending arrangements for the sole purpose of globally resolving the claims via a limited fund class settlement.  Indeed, absent the class arrangement, Inamed would have been unable to procure the $31.5 million, and having to individually litigate each claim would have inevitably driven the company into bankruptcy.  Finding a substantial risk that bankruptcy would have eliminated the possibility of recovery for all claimants, Judge Pointer concluded that the amount of the settlement was fair, adequate, and reasonable.[13]   Further ensuring that the $31.5 million represented the maximum payout to class members, the attorneys' fees were paid from the Common Benefit Fund, established years earlier by a coalition of breast implant manufacturers, rather than the Settlement Fund.  (Doc. #287, 12/14/09 Hearing Transcript 91:9-22).

Additionally, in the context of the fairness inquiry, Judge Pointer responded to the objection raised by several class members at the January 11, 1999 fairness hearing.  Several class members objected to the settlement's lack of a predetermined plan for the fund's distribution. In other words, as of the time Judge Pointer was reviewing the settlement, Inamed was required to infuse the fund with $31.5 million, but the parties had yet to finalize the payout scheme.  Judge Pointer overruled this objection "on the ground that a plan of allocation may properly be considered at a later point in the proceedings, and is not essential to determination of the initial question of whether the overall

---

[13]Class Counsel additionally were involved with Inamed's settlement with 3M.  (Doc. #59, Order 47A ¶ 5(c)). Specifically, 3M agreed to release a preexisting contractual indemnity claim against Inamed's subsidiary, McGhan, in exchange for $3 million.  (Doc. #59, Order 47A ¶ 5(c)).  The claim stemmed from McGhan's 1984 purchase of 3M's plastic surgery business.  (Doc. #290-18, Inamed 1998 10-K at 42-43).  3M asserted substantial indemnity claims against Inamed arising from "claims asserted against 3M in lawsuits involving breast implants manufactured" by McGhan.  (Doc. #290-18, Inamed 1998 10-K at 43).  The potential liability was staggering, and if 3M had litigated rather than settled, then Inamed would have faced the possibility of a significant judgment.  (Doc. #287, 12/14/09 Hearing Transcript 109:19-110:5).

Initially, Inamed requested that the $3 million payment should be credited against its payment to the Inamed Settlement Class.  (Doc. #269-2, Babbitt Aff. ¶ 34).  Class Counsel, however, "took a hard line that the class should bear no portion of the 3M liability, and Inamed, with consent of its senior noteholders, capitulated."  (Doc. #269-2, Babbitt Aff. ¶ 34).  Judge Pointer, aware of the agreement and its importance as a precondition to class settlement, approved the payment as "fair and reasonable from the standpoint of the Inamed Settlement Class."  (Doc. #59, Order 47A ¶ 5(c)).

settlement fund available for distribution is adequate in the circumstances." (Doc. #59, Order 47A ¶ 5(e)).[14]

---

[14]Class Counsel did not naively assume that the settlement would have permanently disposed of Inamed as a going concern. Indeed, investors rarely advance financing without some assurance of a return on investment. Understanding this reality, Class Counsel additionally secured access to Inamed's continuing medical studies conducted as to its breast implants:

> Upon request by Settlement Class Counsel, Inamed agrees to provide the Settlement Class Counsel or their designees access to interim or other reports received from time to time by Inamed, its attorneys, consultants, or persons or entities to whom Inamed has contracted studies or research, of studies concerning Breast Implants, or materials, ingredients, or components thereof, in whole or in part, including reports to the Federal Food and Drug Administration.

Inamed Settlement Agreement IV.C.2, *available at* http://www.fjc.gov/BREIMLIT/ORDERS/inasett.rtf (last visited May 6, 2010). Class Counsel explained the significance of this provision and its non-monetary benefit to the class:

> When [breast implant manufacturers] were later allowed to put [breast implants] on the market for a limited basis for a core study for augmentation patients, they also had to track all those patients in their core study. It was critical to us – recognizing that some day Inamed was going to petition the FDA for a complete removal of any restrictions on the sale of implants, it was critically important to us that we have access to the studies that they were doing as part of the adjunct study and part of their core study. The reason for that was that we heard from class members for years, ["]do not let these things back on the market. We want you to do everything that you can to fight putting these back on the market.["] So a critical element of the settlement was the ability to get at those studies. When it came time in 2003, I believe it was, when the FDA was beginning to consider putting the implants back on the market on an unrestricted basis, we started asking for those studies, and to tell you how contentious our relationship was with Inamed, Your Honor need only look at the docket sheet. There were motions to compel, two trips to the Court of Appeals, emergency motions, responses in 24 hours. It was a highly-contested issue but a critically-important part of the settlement agreement. And once we were able to get access to their information, it allowed the plaintiffs in the litigation to at least get on the same playing field as the manufacturers when it came time to go before the FDA on approval. Otherwise, we would have been absolutely out of luck with no information based on their internal documents.

(Doc. #287, 12/14/09 Hearing Transcript 82:3-83:7).

Juris's counsel has criticized this aspect of the Settlement, as it suggests that Class counsel "knew the company was going to survive." (Doc. #287, 12/14/09 Hearing Transcript 107:4). In response, Leslie Bryan, member of Class Counsel, stated that, "[i]f [Juris's counsel] is suggesting that we should have insisted that Inamed get out of the breast implant business, I am standing here and telling [Juris's counsel] we insisted until we were blue in the face, and we insisted with Mentor Corporation that had a similar limited fund settlement that they get out of the breast implant business. Judge, you don't always get what you want, and yes, did we know they were going to continue to manufacture implants, we knew that they were going to continue to manufacture implants." (Doc. #287, 12/14/09 Hearing Transcript 107:24-108:8).

E.    **1999 Plan of Distribution**

As noted above, Order 47A only (1) certified a limited fund class and (2) approved the settlement insofar as it required Inamed to infuse the fund with $31.5 million.  The court, having previously tabled discussion regarding the plan of distribution, revisited that concern.  Class counsel presented a proposed plan of fund distribution, which called for a pro rata division of the $31.5 million among all claimants, without reference to a claimant's level of injury.  (Doc. #70, Order 47B at 1).  In May 1999, the court preliminarily approved the proposed plan of distribution and ordered notice to be sent to approximately 350,000 implant-recipients on file with the Claims Office.  (Doc. #70, Order 47B at 1).  The notice requested objections and comments on the proposal.  (Doc. #70, Order 47B at 1).  Although 350,000 notices were mailed, only about 45,000 of the claimants were likely Inamed Settlement Class members.  (Doc. #70, Order 47B at 2).  Of the 45,000 affected, the court received sixty-two objections to the proposed distribution plan.  (Doc. #70, Order 47B at 2).  On July 6, 1999, the court held a fairness hearing pursuant to Rule 23(e).  (Doc. #70, Order 47B at 2).

Eleven of the objections concentrated on the perceived inequity of the plan's failure to differentiate between claimants without injuries and claimants with current injuries.  (Doc. #70, Order 47B at 6).  Judge Pointer overruled these objections given the unique financial constraints affecting the settlement terms:

> If the amount of the funds available for distribution were substantially greater and/or the potential distributees not so numerous, the court would agree that such a distribution plan would be preferable notwithstanding the several years delay in receiving and reviewing additional claims and documentation of such criteria.  This fund is, however, so severely limited in relation to the number of potential claimants that such a plan – with its substantially increased

> administrative costs – would not greatly increase the amount of
> distribution to those determined to be eligible for enhanced benefits
> and would, of course, decrease even more the meager distributions to
> other class members.  Class counsel – some of whom represent
> clients with existing medical problems and others of whom represent
> clients without presently documented problems – have, with the
> Court, struggled with this problem and have reluctantly come to the
> conclusion that a pro rata division remains the better – and indeed
> only workable – solution under the facts of this case.  The court
> concurs in this recommendation, which, as noted, includes a waiver
> of any claims by class counsel for fees in connection with this
> settlement.

(Doc. #70, Order 47B at 6).  Additionally, four out of the sixty two respondents filed written

objections claiming "that they have thus far been unable to identify the manufacturer of their

implants and hence may be unable to provide the necessary information for eligibility within the

stated deadline." (Doc. #70, Order 47B at 3).  Nevertheless, Judge Pointer concluded that "given

potential barriers to claims arising from statutes of limitations and the implicit prospect of deferring

division until they have (at some undetermined point in the future) been able (if ever) to obtain such

information, their objection does not call for any change in the plan." (Doc. #70, Order 47B at 3).

In short, Judge Pointer, although acknowledging the imperfection of the pro rata division,

concluded that any of its alternatives were inferior.  (Doc. #70, Order 47B at 6).  Thus, Judge Pointer

approved "as the distribution plan for the Inamed Settlement Fund [an] equal pro rata division of the

net settlement funds . . . and prompt distribution among all eligible class members returning a

satisfactory claim form by October 1, 1999, without any differences in benefits based on . . . the

extent of demonstrable injuries or expenses . . . ." (Doc. #70, Order 47B at 6).  Based on the

aggregate value of the fund and in light of the total number of claimants, each claimant received

approximately $725.00.  (Doc. #277-4, 10/3/08 Hearing Transcript 53:14-15).  Order 47B was not appealed.

F.    **Inamed's Post-Settlement Financial Position**

For fiscal year 1998 and as compared to fiscal year 1997, Inamed's net sales increased by 24%. (Doc. #290-18, Inamed 1998 10-K at 2).  Specifically, Inamed reported the following net sales for fiscal years 1997 and 1998, respectively: $131,566,000 and $189,295,000.  (Doc. #290-18, Inamed 1998 10-K at 15).  For fiscal year 1998, Inamed reported net income of $11,973,000, compared to its net loss in 1997 of $41,577,000.  (Doc. #290-18, Inamed 1998 10-K at 15). However, this "turnaround in profitability" was attributable to: (1) aggressive restructuring and streamlining efforts; (2) the likely resolution of the breast implant litigation; and (3) the availability of alternative financing (which would not have been available in the absence of the probable resolution of the litigation).  (Doc. #290-18, Inamed 1998 10-K at 16).  To be sure, however, Inamed remained a heavily leveraged company.  According to its balance sheet, Inamed's 1998 book value was negative $15,625,000.  (Doc. #290-18, Inamed 1998 10-K at 15).  Its 1997 book value had been negative $46,689,000.  (Doc. #290-18, Inamed 1998 10-K at 15).  Thus, although 1998 saw a significant improvement in Inamed's book value, it was still a debt-ridden company.

Several months into 2000, Inamed filed with the SEC its 10-K for fiscal year 1999, which reflected its finances as of December 31, 1999.  (Doc. #254-8, Inamed 1999 10-K).  For fiscal year 1999, Inamed reported $189.3 million in net sales and $43.7 million in operating income.  (Doc. #254-8, Inamed 1999 10-K at 4-5).  Inamed candidly attributed its profitability to two aggressively pursued goals: (1) "settling the breast implant litigation," and (2) "initiat[ing] a cost reduction program that included reducing overhead through an approximate 10% worldwide reduction in work

force; eliminating underutilized corporate offices and the Company's European sales headquarters; entering into a strategic alliance with the Company's supplier of silicone raw materials; moving the Company's corporate headquarters from Las Vegas to Santa Barbara; and terminating or selling unprofitable business lines." (Doc. #254-8, Inamed 1999 10-K at 30).

On September 1, 1999, Inamed purchased Collagen Aesthetics, Inc. for approximately $159 million and funded the acquisition through substantial borrowing. (Doc. #254-8, Inamed 1999 10-K at 7; Doc. #293-2, Exhibit B at 2). In the same year, Inamed raised approximately $78.3 million through a public offering of common stock. (Doc. #254-8, Inamed 1999 10-K at 7). The company used the proceeds to pay down the debt incurred in connection with the purchase of Collagen Aesthetics, Inc. (Doc. #254-8, Inamed 1999 10-K at 7). Nevertheless, in the wake of the Inamed Class Settlement, the company acknowledged that its financial viability remained precarious given the nature of the products manufactured:

> Sales of our breast implant, tissue expander and collagen-based facial implant products account for a substantial majority of our net sales. We expect our revenues to continue to be based primarily on sales of these principle products. Adverse rulings by regulatory authorities, product liability lawsuits, introduction of competitive products by third parties, the loss of market acceptance or other adverse publicity for these principal products may significantly and adversely affect our sales of these products and, as a result, would adversely affect our business, financial condition and results of operation.
> . . . .
> We face an inherent risk of exposure to product liability claims alleging that the use of our technology or products has resulted in adverse health effects. The risks of litigation exist even with respect to products that have received or in the future may receive regulatory approval for commercial sale. . . . In particular, the manufacture and sale of breast implant products entails significant risk of product liability claims due to potential allegations of possible

28

> disease transmission and other health factors, rupture or other product
> failure and product recalls. . . .

(Doc. #254-8, 1999 Inamed 10-K at 37-38).

## G.   Zuzanna Juris's 2006 Litigation

In 1989, Zuzanna Juris received her first breast implants.  (Doc. #277-4, 10/3/08 Hearing

Transcript 24:23-25).  In 1991, as a result of capsular contraction, a doctor removed the implants,

and Juris received her second breast implants.  (Doc. #277-4, 10/3/08 Hearing Transcript 24:18-22,

26:6-9).  In the early 1990s, after the FDA placed a moratorium on breast implant procedures and

certain breast implants were being recalled, Juris consulted her plastic surgeon regarding whether

her second implants were safe.  (Doc. #277-4, 10/3/08 Hearing Transcript 22:7-13).  Her plastic

surgeon told her that the silicone ban "had nothing to do with [her implants] . . . and [that she] had

the latest, most modern implants available on the market, and that they [would] last [her] a lifetime

. . . ."  (Doc. #277-4, 10/3/08 Hearing Transcript 22:16-23).[15]

Around 2002, Juris began experiencing "chronic fatigue, severe chest wall and breast pain,

capsular contraction, joint and muscle pain, muscle weakness, significant weight loss, severe

headaches, skin rashes, memory loss, and loss of mental acuity."  (Doc. #217-5, Juris Compl. ¶ 28).

Eventually, in May 2005, a surgeon removed Juris's implants.  (Doc. #217-5, Juris Compl. ¶ 28).

Upon removal, the surgeon discovered that Juris's implants had "deflated and leaked silicone and

silicone gel into her chest cavity and axillary lymph nodes.  In addition, the implant capsule was

chronically infected.  It was determined that . . . [Juris] was suffering from silicone-related immune

---

[15]Other than this testimony, the record is silent as to why Juris – who was concerned enough to make inquiry
to her doctor about the safety of her new implants – did not learn from him the name of the company who manufactured
them.

dysfunction, atypical neurological disease and infection." (Doc. #217-5, Juris Compl. ¶ 28). It was only after the removal that Juris learned that Inamed manufactured her implants – she did not know that her implants were Inamed brand (1) when they were implanted in 1991 or (2) during the time period prior to or contemporaneous with Judge Pointer entering Orders 47, 47A, or 47B. (Doc. #277-4, 10/3/08 Hearing Transcript 37:3-8).

On March 23, 2006, Allergan, Inc. purchased substantially all of Inamed's outstanding common stock. (Doc. #217-5, Juris Compl. ¶ 8). By purchasing Inamed, Allergan also purchased Inamed's wholly-owned subsidiary, McGhan Medical Corporation. (Doc. #217-5, Juris Compl. ¶ 8). On May 16, 2006, Juris filed a lawsuit in the Superior Court of California for the County of Los Angeles (the "California State Court") against Allergan, Inamed, and McGhan. (Doc. #217-5, Juris Compl. ¶¶ 2-7). In her complaint, Juris, alleging injuries related to Inamed/McGhan breast implants that she received, brought claims against Allergan, Inamed, and McGhan for (1) strict liability; (2) negligence; (3) breach of express warranty; (4) breach of implied warranty; (5) deceit/negligent misrepresentation; and (6) intentional infliction of emotional distress. (Doc. #217-5, Juris Compl. ¶¶ 36-72).

On September 20, 2006, Inamed and Allergan filed a motion requesting this court to issue an order requiring Juris and her attorney to show cause why they should not be held in contempt of the injunction embodied in Judge Pointer's Order 47A. (Doc. #208). Specifically, Inamed and Allergan contended that, because (1) Juris is a member of the Inamed Settlement Class and (2) her claims against Inamed and Allergan are "settled claims" as defined in Order 47A, Judge Pointer's injunction precludes her lawsuit. In response, on October 19, 2006, counsel for both parties

30

requested the California state court to stay the proceedings pending decision by the Northern District of Alabama. (Doc. #277-2, Decl. of Cynthia LeBow ¶ 8).

In this court, on November 17, 2006, Juris filed her opposition to the show cause motion. (Doc. #217). On January 5, 2007, Inamed and Allergan replied to Juris's opposition. (Doc. #225). In July 2008, Judge Clemon (who previously acted as the MDL transferee judge in 2:92-CV-10000) scheduled a hearing on the motion, and on October 3, 2008, Judge Clemon traveled to California and heard evidence and argument from both parties. (Doc. #277-2, Decl. of Cynthia LeBow ¶¶ 10-11; Doc. #277-4, 10/3/08 Hearing Transcript 1). On April 14, 2009, Juris filed a post-hearing memorandum responding to various issues raised at the hearing. (Doc. #265).[16] On April 28, 2009, Inamed and Allergan responded to Juris's memorandum. (Doc. #269). On May 8, 2009, Juris filed her reply submission to Inamed and Allergan's responsive memorandum. (Doc. #270).

On November 12, 2009, Juris filed a notice with the Northern District of Alabama, which informed the court of her intention to proceed with the California litigation. (Doc. #277). Specifically, on the same day as the notice filed with this court, Juris filed a motion with the California state court requesting it to lift the voluntarily agreed upon stay. (Doc. #277-2). The next day, this court informed the parties that a hearing on Defendants' motion would be held within two to four weeks. As a result, the California State Court continued Juris's hearing until December 18, 2009. (Doc. #278-2). On December 14, 2009, the court heard oral argument from Juris's counsel, Defendants' counsel, and Settlement Class Counsel. On January 25, 2010, Juris and Defendants submitted post-hearing briefs. (Docs. #288, 289). On February 8, 2010, they submitted post-hearing

---

[16]On November 12, 2008, Judge Clemon, who previously presided over this matter, recused, and the case was reassigned to Magistrate Judge Greene. (Doc. #258). In February 2009, this case was transferred to the undersigned.

reply briefs.  (Docs. #292, 293).  Accordingly, this matter, having undergone three rounds of briefing and two hearings, is now properly under submission.

## II.    STANDARD OF REVIEW

The California proceedings have unquestionably evolved into a collateral attack on Orders 47A and 47B, insofar as they purportedly precluded Juris's individual claims against Defendants. In particular, Juris filed her Complaint in California State Court and asserted Settled Claims otherwise extinguished by this court's resolution of the Inamed class action.  (Doc. #217-5).  In response, Defendants filed a demurrer as to Juris's Complaint and argued, *inter alia*, that the "doctrine of *res judicata* also gives conclusive effect to the settlement and bars [Juris] from re-litigating her claims in this case."  (Doc. #217-7, Defendants' Demurrer at 4).  In response, Juris contended that application of *res judicata* would deprive her of the constitutional right to due process.  (Doc. #217 ¶ 15).  Raising *res judicata* as a defense to a settled claim and the responsive argument that *res judicata* is inapplicable because of an alleged procedural violation is the paradigmatic collateral proceeding.

When Defendants filed their Motion for Order to Show Cause, which commenced proceedings in this court, Juris initially contended that she may select the forum in which to conduct her collateral attack: "A class member has the right to challenge, in her local forum, the approval of a mandatory class settlement for failure to satisfy due process requirements of adequate representation or proper notice."  (Doc. #217 at 19).  Despite her initial reservation, Juris subsequently requested the California State Court to stay those proceedings because "it is necessary and appropriate for [the Northern District of Alabama] to review and interpret Order No. 47A, and

to determine its effect on [her] claims in [the state court proceedings]." (Doc. #269-1, Joint Notice at 8).

In light of this statement, Defendants classified Juris's newly raised argument in this court regarding forum selection as "disingenuous at best." (Doc. #269 at 8 n.2). In response, Juris stated that "[d]espite [her] continuing belief that the California court *could* properly address the issue of whether [her] claims were barred by *res judicata*, out of deference for [the Northern District of Alabama] Plaintiff Juris and her counsel nonetheless agreed that this court could rule on the issue in the first instance." (Doc. #270 at 1 n.2) (emphasis added). Moreover, after this court's December 2009 hearing, Juris submitted a brief, which altogether dropped her argument that she may collaterally attack Order 47A in California State Court.[17] (Doc. #288). Rather, Juris exclusively argued that (1) application of *res judicata* to her claims would violate due process; (2) this court lacks personal jurisdiction over her; and (3) Judge Pointer erroneously certified the class action and erroneously approved the settlement. (Doc. #288).

The court highlights the evolution of Juris's arguments because they are relevant in determining the appropriate analytical framework the court must employ. Indeed, it is axiomatic that a party must identify some basis in law for requesting judicial action. Juris's arguments have evolved from defensive, forum-specific contentions to offensive, relief-oriented requests. Her arguments, if accepted by this court, would require dissolving the anti-suit injunction, at least insofar as it concerns her, and thereby permitting the California State Court litigation to proceed. The court

---

[17]Even though it appears that Juris has abandoned this argument, the court, nevertheless, addresses this contention. *See* discussion *infra* Part III.A.

construes the affirmative nature of her request as a motion[18] for relief pursuant to Federal Rule of

Civil Procedure 60(b), which authorizes a court to "relieve a party or its legal representative from

a final judgment, order, or proceeding" for various reasons.  *See* 3 NEWBERG ON CLASS ACTIONS §

8.30 (4th ed. 2009) ("A related, collateral method for attacking judgment finality after expiration of

the appeals period is available under Rule 60(b).").  Rule 60(b) warrants such relief only under

limited circumstances:

> (1)  mistake, inadvertence, surprise, or excusable neglect;
> (2)  newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3)  fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4)  the judgment is void;
> (5)  the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6)  any other reason that justifies relief.

FED. R. CIV. P. 60(b)(1)-(6).  The particular subdivision of Rule 60(b), and its attendant contours,

that each argument fits is addressed, as applicable, throughout this Memorandum Opinion.[19]

## III.   DISCUSSION

Juris asserts essentially four arguments: (1) she may raise a collateral attack against the

Inamed Class Settlement in the forum of her choice; (2) in light of *Ortiz v. Fibreboard Corp.*, 527

---

[18]Juris has never filed a "motion" for affirmative relief from the Inamed Settlement.  Her briefs, however, as well as her counsel's representations at oral argument, are undeniably requests for relief.  Typifying the affirmative nature of her request, Juris's counsel stated the following at the December 14, 2009 hearing: "[O]bviously what we have been here for is allowing [Juris] to proceed with her claims.  I mean that's what this is all about."  (Doc. #287, 12/14/09 Hearing Transcript 115:25-116:2).  As a functional matter, and avoiding rigid formalism, the court construes Juris's various requests as Rule 60(b) motions.

[19]Although Rule 60(b) motions must be brought within one year of judgment or within a reasonable period, depending on the particular basis for relief, FED. R. CIV. P. 60(c), Defendants have not contended that Juris's requests are untimely.  Thus, the court assumes without deciding that Juris's request satisfies Rule 60(c).

U.S. 815 (1999), Judge Pointer erroneously certified the Inamed Class under Rule 23(b)(1)(B); (3) even if correctly certified, she has a right to opt out of the Inamed Settlement Class, and absent such a right, this court lacks personal jurisdiction over her; and (4) Judge Pointer's anti-suit injunction, contained in Order 47A, is unenforceable because it does not satisfy the exceptions to the Anti-Suit Injunction Act.  The court addresses each of Juris's arguments in turn.

## A.    __Proper Forum for a Collateral Attack__[20]

At least at one point earlier in this case, Juris contended that she alone has the right to select the court in which to conduct the collateral review of this court's certification and approval of the Inamed settlement.  Since that time, she appears to have abandoned this argument.  That is, Juris has now apparently consented to this court's jurisdiction when she stated that "it is necessary and appropriate for [the Northern District of Alabama] to review and interpret Order No. 47A, and to determine its effect on [her] claims in [the state court proceedings]."  (Doc. #269-1 at 8).  Nevertheless, out of an abundance of caution, the court will fully analyze the issue of the appropriate forum on the merits.

When she did make the argument regarding forum choice, Juris relied on three cases: (1) *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002); (2) *Stephenson v. Dow Chemical Co.*, 273 F.3d 249 (2d Cir. 2001), *aff'd in part*, 539 U.S. 111 (2002); and (3) *In re Real Estate Title & Settlement Services Antitrust Litigation*, 869 F.2d 760 (3d Cir. 1989).  Contrary to Juris's contentions, these cases do not help her.

---

[20]This challenge is ancillary to the validity of the judgment and, therefore, is not evaluated through the lens of Rule 60(b).

First, in *Syngenta*, the Supreme Court addressed whether a state court action, proceeding contrary to a federally approved class settlement, could be removed via the All Writs Act. 537 U.S. at 30-31. In affirming the Eleventh Circuit, the Supreme Court held that "[b]ecause the All Writs Act does not confer jurisdiction on the federal courts, it cannot confer the original jurisdiction required to support removal pursuant to [28 U.S.C.] § 1441." *Id.* at 33.

*Syngenta* stands for the limited (and unspectacular) proposition that the All Writs Act is not "jurisdictional caulk . . . plug[ging] the cracks in federal jurisdiction through which crafty litigants can escape the effect of a federal order." *Henson v. Ciba-Geigy Corp.*, 261 F.3d 1065, 1070 (11th Cir. 2001). In *Syngenta*, the Supreme Court's analysis focused only on whether the All Writs Act is a valid source of federal removal jurisdiction. *Syngenta*, 537 U.S. at 33. Unlike the posture in *Syngenta*, Defendants have not attempted to remove Juris's state court action and to transfer it to this court. Instead, this court, pursuant to Order 47A, retains continuing ancillary enforcement jurisdiction over the settlement reached in the Inamed class action. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994) (holding that a federal court may retain jurisdiction to enforce a settlement agreement). But more saliently, *Syngenta* does not reach the critical issue: whether Juris has a right to mount a collateral attack in the forum of her selection.[21]

Second, in *Stephenson*, the Second Circuit reviewed a decision enjoining state court litigation concerning claims related to Agent Orange injuries. *Stephenson*, 273 F.3d at 251. In particular, in 1983, the Eastern District of New York certified a class action pursuant to Rule 23(b)(3), which

---

[21]As an aside, *Syngenta* does offer the following advice to class action defendants hoping to control collateral proceedings: "One in [a class action defendant's position] may apply to the court that approved a settlement for an injunction requiring dismissal of a rival action. [A class action defendant] could also have sought a determination from the . . . state court that [the class member's] action was barred by the [preexisting] judgment . . . ." *Syngenta*, 537 U.S. at 34 n.*. Although far from a formal holding, the Court's observation does hint that a class member's choice of forum is not as flexible as Juris suggests and that, indeed, this is a proper forum to collaterally review Orders 47A and 47B.

included "those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange . . . ."  *Id.* at 252 (citation omitted).  On the eve of trial, the parties settled.  *Id.* (citation omitted).  According to the settlement's terms, the "defendants would pay $180 million into a settlement fund." *Id.* (citation omitted).  The class included individuals who had not yet manifested injuries.  *Id.* (citation omitted).  Additionally, the district court retained continuing jurisdiction to supervise and enforce the terms of the agreement pending final disposition of the settlement fund. *Id.* (citation omitted).

After the district court held several fairness hearings, it approved the settlement as fair, adequate, and reasonable.  *Id.* (citation omitted).  The district court rejected a motion to certify sub-classes.  *Id.* (citation omitted).  According to the settlement, payments would begin January 1, 1985 and end December 31, 1994: "No payment will be made for death or disability occurring after December 31, 1994."  *Id.* at 253 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1417 (E.D.N.Y. 1985)).   Furthermore, the court enjoined "all class members from commencing any action arising out of Agent Orange exposure."  *Id.* at 254.  The Second Circuit "affirmed class certification, settlement approval and much of the distribution plan."   *Id.* at 253 (citation omitted).

In 1998, Joe Isaacson filed a lawsuit in New Jersey state court against the defendants in the above settlement.  *Id.* at 255.  In his complaint, he alleged that, as a result of being exposed to the defendants' Agent Orange in Vietnam from 1968 to 1969, he had developed non-Hodgkin's lymphoma in 1996.  *Id.* at 255-256.  Similarly, in 1999, Daniel Stephenson filed a lawsuit in the Western District of Louisiana against the same released defendants.  *Id.* at 256.  In his complaint,

he alleged that, as a result of being exposed to the defendants' Agent Orange in Vietnam from 1965 to 1970, he had developed bone marrow cancer in 1996. *Id.* at 255-56. After removing Isaacson's state court lawsuit, the defendants petitioned the Judicial Panel on Multidistrict Litigation to transfer both Isaacson's and Stephenson's lawsuits to the Eastern District of New York. *Id.* at 256. The MDL Panel granted the transfer, and before the Eastern District of New York, the defendants filed a Rule 12(b)(6) motion to dismiss, which asserted that "plaintiffs' claims were barred by the 1984 class action settlement and subsequent final judgment." *Id.* Isaacson and Stephenon argued that the 1984 settlement denied them adequate representation because their injuries manifested after the fund depleted. *Id.* The MDL transferee court granted the defendants' motion, but the Second Circuit vacated and remanded. *Id.* Specifically, the Second Circuit considered the following two issues: (1) whether defendants properly removed Isaacon's lawsuit pursuant to the All Writs Act; and (2) whether a class member, asserting inadequate representation, may collaterally attack the class settlement, in general, and the application of *res judicata*, in particular.

Regarding the removal, the Second Circuit concluded that the All Writs Act is a valid jurisdictional predicate to remove an otherwise unremovable case in "exceptional circumstances." *Id.* at 256. The court held that Isaacson's state court action constituted an "exceptional circumstance" because "maintenance of [his] action[] in state court necessarily requires interpretation of the scope of the Agent Orange Settlement and could have the potential to disturb the judgment underlying the settlement depending on the position taken by defendants." *Id.* Critically, although the Second Circuit ultimately held that "Isaacson's suit is not precluded by the settlement judgment, removal and transfer were appropriate simply for the purpose of determining the settlement's preclusive effect." *Id.* at 256-57. "Indeed, the court 'best situated to make this determination' is the court that entered

judgment.'" *Id.* at 257 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1431 (2d Cir. 1993)).   Further amplifying this point, the Second Circuit specifically stated that "[t]his conclusion is not altered by our determination that the district court erred."   *Id.*

Turning to the collateral attack, the defendants differentiated between a collateral attack against a judgment and a collateral attack against an injunction.  *Id.* at 257.   According to the defendants, Isaacson's and Stephenson's lawsuits attempted to circumvent the Eastern District of New York's injunction as opposed to testing whether they had been adequately represented. *Id.*  The Second Circuit rejected this distinction.  *Id.*  According to the court, "[t]he injunction was part and parcel of the judgment that plaintiffs contend failed to afford them adequate representation.   If plaintiffs' inadequate representation allegations prevail . . . the judgment, which includes the injunction on which defendants rely, is not binding as to these plaintiffs."  *Id.*

As a general proposition, the Second Circuit concluded that a "judgment in a class action is not secure from collateral attack unless the absentees were adequately and vigorously represented." *Id.* at 259 (citation omitted).  The court, however, avoided deciding whether an earlier determination concerning adequacy of representation bars those similarly situated from later raising the same challenge.  *Id.* at 257.   Instead, the court assumed the accuracy of the defendants' position: "[E]ven if, as defendants contend, collateral attack is only permitted where there has been no prior determination of the absent class members' rights, plaintiffs' collateral attack is allowed."  *Id.*  The court reached this conclusion because "there [had] been no prior adequacy of representation determination with respect to individuals whose claims arise after the depletion of the settlement fund."  *Id.* at 258.  Thus, the Second Circuit held "that a collateral attack to contest the application of *res judicata* is available."  *Id.* at 259.

39

Finally, the court reviewed the merits of the *res judicata* argument. *Id.* Isaacson and Stephenson argued that, contrary to the traditional *res judicata* requirements, their cases do not involve "the same parties or their privies" as the 1984 class settlement. *Id.* The Second Circuit observed that an irreconcilable conflict had existed: "Because the prior litigation purported to settle all future claims, but only provided for recovery for those whose death or disability was discovered prior to 1994, the conflict between Stephenson and Isaacson and the class representatives becomes apparent. . . . Stephenson and Isaacson were not adequately represented in the prior Agent Orange litigation." *Id.* at 260-61. Accordingly, the Second Circuit vacated the district court's dismissal order and remanded for a rehearing on *res judicata*. *Id.* at 261.[22]

Two conclusions relevant to this case can be drawn from the Second Circuit's decision in *Stephenson*. First, a litigant's ability to collaterally attack a class settlement is not limited to the judgment itself; instead, to the extent that the judgment contained an anti-suit injunction, the class member, in an ancillary proceeding, may challenge the injunction as well as the underlying judgment. Second, the court best suited to entertain such a challenge is the court that entered the judgment and from which the injunction issued. The Second Circuit more directly reached this second conclusion in an earlier iteration of the Agent Orange appeals: "Although appellants' attack is founded on their constitutional right to due process, nothing in the Constitution or in our jurisprudence demands that class members have an unchallengeable choice of forums in which to launch it." *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1432-33 (2d Cir. 1993).

---

[22]On certiorari review, the Supreme Court vacated the Second Circuit's decision insofar as it concerned removal jurisdiction under the All Writs Act and in light of *Syngenta*. *Dow Chem. Co. v. Stephenson*, 539 U.S. 111, 112 (2003). As to the Second Circuit's *res judicata* analysis, including the court's conclusion regarding the proper forum for a collateral attack, the decision was "affirmed by an equally divided Court." *Id.*

Finally, in *In re Real Estate Title and Settlement Services Antitrust Litigation*, the Third Circuit considered "whether an absent class member can be enjoined from relitigation if the member does not have minimum contacts with the forum."  869 F.2d at 769.  The court held that "if the member has not been given the opportunity to opt out in a class action involving both important injunctive relief and damage claims, the member must either have minimum contacts with the forum or consent to jurisdiction in order to be enjoined by the district court that entertained the class action."  *Id.*  In reaching this decision, the Third Circuit sidestepped deciding "whether an absent plaintiff can be bound to the judgment in a hybrid (damage and injunctive) class action if it was not afforded the opportunity to opt out."  *Id.* at 768-69.  According to the court, that decision was unnecessary "because an absent plaintiff is not subject to the burdens of distant forum litigation when it is bound to a class action settlement, as long as it can challenge the adequacy of representation in the forum of its choice."  *Id.* at 769.  In short, the Third Circuit's rule permits a class member to escape the federal court's anti-suit injunction if the class action is mandatory and the absent class member does not have minimum contracts with the forum in which the district court sits.  *Id.*

It is undisputed that (1) the Inamed Class Settlement was certified as a mandatory class action and (2) Juris lacks the requisite minimum contacts to Alabama and has not consented to this court's jurisdiction in the traditional sense.  Even (charitably) assuming that *Real Estate Title* demands the conclusion Juris asserts, that would only help her if this court sat in Pennsylvania or New Jersey, or one of the other states in the Third Circuit.[23]  The problem for Juris, however – and perhaps the

---

[23]The court notes that the Third Circuit generally analyzed the protections accorded to absentee class members in a mandatory class action, but the court did not decide "the due process requirements in a class action certified under Rule 23(b)(1)(B) in which there is only a limited common fund from which the plaintiffs can obtain relief."  *Real Estate Title*, 869 F.2d at 768 n.8.  At the very least, the Third Circuit's qualification suggests that limited funds, although "mandatory," may warrant consideration distinct from the *Real Estate Title* holding.  At least one court in the Third Circuit has reached precisely this result.  *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 180-81 (E.D.

reason that she has abandoned this argument – is that the Third Circuit's rule cannot be reconciled with the Eleventh Circuit's decision in *Battle v. Liberty National Life Insurance Co.*, 877 F.2d 877 (11th Cir. 1989).

*Battle* concerned whether a federal district court may enjoin absentee class members' collateral attacks in state court against a finally approved settlement. *Id.* at 879. In *Battle*, the Northern District of Alabama certified a Rule 23(b)(2) mandatory, non-opt out class against funeral home businesses. *Id.* at 879 n.1. In 1978, the Northern District of Alabama approved the proposed settlement and retained jurisdiction over its enforcement. *Id.* at 880.

In 1983, dissatisfied members of the class filed a lawsuit in Alabama state court against the *Battle* settlement's defendants. *Id.* In response, the defendants filed a motion for summary judgment, which argued the settlement's preclusive effect. *Id.* The trial court granted the summary judgment motion, but the Alabama Supreme court reversed the dismissal and held that (1) the federal court should have certified the class pursuant to Rule 23(b)(3); (2) the plaintiffs in the instant case had not received notice of the class settlement; and (3) the class representatives had not adequately reflected the present plaintiffs' interests. *Id.* On remand from the Alabama Supreme Court, the plaintiffs amended their state court complaint and added class allegations. *Id.*

In response to the state court litigation, Judge Hancock, who was presiding over the settled federal class action, granted the federal defendants' motion to preliminarily enjoin the state court proceeding and, eventually, permanently enjoined its continued prosecution. *Id.* The plaintiffs appealed, and the Eleventh Circuit affirmed. *Id.* at 883. The court held that the plaintiffs' "due process challenge is not foreclosed; it simply must be brought in the forum which has lived with this

---

Pa. 1997) (certifying a limited fund class action and distinguishing Real Estate Title on this basis).

case for nearly two decades." *Id.* at 883. Indeed, the district court had presented the plaintiffs with

two options:

> The . . . preliminary injunction made it plain that *the only*
> *appropriate method by which respondents can challenge at this late*
> *date the Battle Final Judgment is to file in this court* (1) a motion
> under FRCP Rule 60(b) or (2) an independent action predicated upon
> a claim of inadequacy of representation of the policyholder class or
> upon a claim of fraud on this court.

*Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449, 1458 (N.D. Ala. 1987) (emphasis added),

*aff'd*, 877 F.2d 877 (11th Cir. 1989). Affirming this decision, the Eleventh Circuit settled the law:

collateral attacks, although permissible, are appropriately considered by the class action court.

The Eleventh Circuit, agreeing with the general proposition that collateral attacks are

available, placed an important limitation on their scope that the Third Circuit explicitly rejected.

*Compare Real Estate Title*, 869 F.2d at 770 ("Under the title companies' rule, defendants would be

able to funnel all of these challenges into the class action court by bringing injunction actions. This

kind of consolidation would not necessarily be efficient, since it would not be sourced in a judge's

belief that efficiency would be furthered by consolidation, but instead would arise as a product of

the defendant's litigation strategy.") *with Battle*, 877 F.2d at 883 ("Their due process challenge is not

foreclosed; it simply *must* be brought in the forum which has lived with this case for nearly two

decades.") (emphasis added). Accordingly, Juris has abandoned her forum selection argument with

good reason. To the extent that Juris opts to pursue a collateral attack, this court is the proper forum.

**B.**     **Certification Pursuant to Rule 23(b)(1)(B)**

Juris contends that the Inamed Class Settlement does not satisfy the requirements for Rule 23(b)(1)(B) class actions as outlined in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).   That assertion misses the mark for two reasons.   First, Juris's contention that Order 47A, entered February 1, 1999, violates the commands of *Ortiz*, decided June 23, 1999, amounts to an improper basis for relief under Rule 60.   Second, Judge Pointer's certification of the Rule 23(b)(1)(B) class was proper.

To the extent that Juris requests exclusion on account of *Ortiz*, at best, her claim fits Rule 60(b)(5), but as a general matter, Rule 60(b)(5) authorizes a district court to set aside a judgment when "it is based on an earlier judgment that has been reversed or vacated."   *See Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977) ("Instead it is settled that such relief is extraordinary and may be granted only upon a showing of 'exceptional circumstances.'   Thus a party seeking such relief must bear a heavy burden of showing circumstances so changed that dangers, once substantial, have become attenuated to a shadow, and that, absent such relief, an extreme and unexpected hardship will result.   We think a healthy respect for the finality of judgments demands no less.") (citations and internal quotation marks omitted).

In this case, Judge Pointer did not rely on a subsequently vacated or reversed decision as the basis for certification; instead, he concluded, based on the law *at the time of his decision*, that Rule 23(b)(1)(B) requirements were met.   Importantly, *Ortiz* merely clarified the law – the decision did not overrule prior cases on which Judge Pointer relied when deciding to certify the Inamed Class. Juris may not challenge the applicability of *Ortiz*; indeed, an approach that permits a litigant to contest prior judgments on the basis of a subsequently decided appellate case would render finality an illusory pursuit.   *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 350 F.3d 360, 364 (3d Cir.

44

2003) ("[After *Ortiz*], [t]o the extent the objectors wish to challenge the indemnification provision itself, their opportunity to do so was at the approval stage and on appeal from that order, and has long passed.") (citation omitted).

Moreover, Juris has not identified any case, from this Circuit or elsewhere, that authorizes an absentee class member to contest the basis for class certification through Rule 60(b) in lieu of an appeal. In fact, the general rule is that a collateral attack, such as one launched through Rule 60(b) proceedings, is *not* a vehicle for subsequently correcting a past error of law, which undoubtedly includes a conclusion as to certification under Rule 23(b). *See, e.g.*, *Am. Bankers Ins. Co. v. Northwestern Nat'l Ins. Co.*, 198 F.3d 1332, 1338 (11th Cir. 1999) ("[T]he law is clear that Rule 60(b) may not be used to challenge mistakes of law which could have been raised on direct appeal.") (citation omitted); *Alvestad v. Monsanto Co.*, 671 F.2d 908, 912 (5th Cir. 1982) ("While we thus have admonished district courts that they should honor requests to reform a judgment in obvious conflict with a clear statutory mandate, we have been equally insistent that Rule 60(b) is not a substitute for the ordinary method of redressing judicial error – appeal."). In short, Juris's substantive attack on Orders 47A and 47B, which were not appealed, is foreclosed as a matter of law.

But even if Juris were able to contest Judge Pointer's conclusions of law, the court finds in the alternative that the Inamed Class Settlement was properly certified as a limited fund. Rule 23(b)(1)(B) authorizes the maintenance of class actions if "prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Rule 23(b)(1)(B) is commonly applicable in so-called "limited fund" cases. "A

limited fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest, and an apportionment or determination of the interests of one class member cannot be made without affecting the proportionate interests of other class members similarly situated." 2 NEWBERG ON CLASS ACTIONS § 4:9 (4th ed. 2009).  According to Juris, Judge Pointer erroneously certified the Inamed Class under Rule 23(b)(1)(B).[24]  Juris reaches this conclusion based on the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which was released nearly five months after Judge Pointer entered Order 47A.

Although *Ortiz* provides the only modern treatment by the Court as to Rule 23(b)(1)(B) limited fund class actions, its facts are important to understanding its scope.  From the 1920s until the 1970s, Fibreboard manufactured a variety of products that contained asbestos.  *Ortiz*, 527 U.S. at 822.  During the 1980s and 1990s, individuals began filing personal injury lawsuits against the company for asbestos-related illnesses.  *Id.*  Fibreboard, confronted with these lawsuits, engaged in protracted litigation with two insurers, Continental Casualty Company and Pacific Indemnity Company, over alleged products liability coverage for years 1956 through 1959.  *Id.*  In 1990, the coverage litigation reached a turning point when a California state court concluded that both insurers were responsible for indemnification as to any claim by a plaintiff exposed prior to the respective policy's expiration date.  *Id.* at 822-23.  Both insurers appealed.  *Id.* at 823.

In late-1992 and early-1993, Fibreboard approached a group of leading plaintiffs' lawyers who specialized in asbestos litigation to discuss the possibility of "global settlement."  *Id.* at 823-24.

---

[24]Importantly, aside from adequacy of representation, Juris has never contended that Judge Pointer erroneously concluded that Rule 23(a)'s threshold requirements were met.  Instead, her principal argument is that he misapplied Rule 23(b)(1)(B).  The court, therefore, limits its consideration only to Rule 23(b) and expresses no opinion whatsoever as to Judge Pointer's numerosity, commonality, or typicality findings.

46

Faced with practically unlimited indemnification liability, Continental Casualty participated in these discussions. *Id.* at 824. "Negotiations continued through the spring and summer of 1993, but the difficulty of settling both actually pending and potential future claims simultaneously led to an agreement in early August to segregate and settle an inventory of some 45,000 pending claims, being substantially all those filed by one of the plaintiffs' firms negotiating the global settlement. The settlement amounts per claim were higher than average with one-half due on closing and the remainder contingent upon either a global settlement or Fibreboard's success in the [California] coverage litigation." *Id.* In other words, Class Counsel negotiated a side agreement, which accorded differential benefits to plaintiffs similarly situated to the putative class members.

Soon thereafter, with the impending California coverage appeal set to be heard on August 27, 1993, the negotiators "finally agreed upon $1.535 billion as the key term of a Global Settlement Agreement. $1.525 billion of this sum would come from Continental and Pacific, in the proportion established by the California trial court in the coverage case, while Fibreboard would contribute $10 million, all but $500,000 of it from other insurance proceeds."[25] *Id.* at 824-25 (internal quotation marks omitted). Hedging their bets, Continental, Pacific, and Fibreboard entered into the so-called "Trilateral Settlement Agreement," which resolved the coverage litigation and required Continental and Pacific to pay $2 billion to Fibreboard in the event that the Global Settlement Agreement did not receive judicial support. *Id.* at 825.

---

[25]Fibreboard was to contribute a very small percentage of the settlement proceeds, and the settlement essentially left untouched its $235 million in remaining assets (not to mention the insurance companies' remaining assets, which totaled in the billions of dollars). These facts exposed the fiction that the district court and the Fifth Circuit erroneously relied upon – the $1.535 billion settlement kitty was not a limited fund.

Accordingly, on September 9, 1993, a group of named plaintiffs filed a Rule 23(b)(1)(B) mandatory class action only for settlement purposes in the Eastern District of Texas and sought approval of the Global Settlement Agreement. *Id.* at 825. The representatives defined their class to include "all persons with personal injury claims against Fibreboard for asbestos exposure who had not yet brought suit or settled their claims before the previous August 27; those who had dismissed such a claim but retained the right to bring a future action against Fibreboard; and past, present and future spouses, parents, children, and other relatives of class members exposed to Fibreboard asbestos." *Id.* at 825-26 (internal quotation marks omitted). Excluded from this class, however, were "claimants with actions presently pending against Fibreboard or claimants who filed and, for cash payment or some other negotiated value, dismissed claims against Fibreboard, and whose only retained right is to sue Fibreboard upon development of an asbestos-related injury." *Id.* at 826 (internal quotation marks omitted). The class complaint contained only personal injury claims. *Id.*

According to the terms of the Global Settlement Agreement, Fibreboard, Continental, and Pacific "would establish a trust to process and pay class members' asbestos personal injury and death claims. Claimants seeking compensation would be required to try to settle with the trust. If the initial settlement attempts failed, claimants would have to proceed to mediation, arbitration, and a mandatory settlement conference. Only after exhausting that process could claimants go to court against the trust, subject to a limit of $500,000 per claim, with punitive damages and prejudgment interest barred. Claims resolved without litigation would be discharged over three years, while judgments would be paid out over a 5- to 10-year period." *Id.* at 827.

After extensive notice efforts, the Eastern District of Texas held an eight-day fairness hearing, and afterwards the court certified the class pursuant to Rule 23(b)(1)(B) and approved the

48

Global Settlement Agreement as fair, adequate, and reasonable. *Id.* In support of its decision as to the propriety of Rule 23(b)(1)(B) class treatment, the Eastern District of Texas concluded both the "disputed insurance asset liquidated by the $1.535 billion Global Settlement, and, alternatively, the sum of the value of Fibreboard plus the value of its insurance coverage, as measured by the insurance funds' settlement value, to be relevant limited funds." *Id.* at 828 (internal quotation marks omitted). Eventually,[26] the Supreme Court considered the propriety of limited fund treatment under these circumstances.

For the *Ortiz* Court, the "nub of [the] case [was] the certification of the class under Rule 23(b)(1)(B) on a limited fund rationale . . . ." *Id.* at 831. To identify the necessary conditions required for limited fund treatment, the Court traced the historical uses of mandatory class actions. *Id.* at 832-37. Distilling the three essential characteristics of limited fund classes, the Court observed that the "cases forming the pedigree of the limited fund class action as understood by the drafters of Rule 23 have a number of common characteristics, despite the variety of circumstances from which they arose." *Id.* at 838.

"The first and most distinctive characteristic is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the

---

[26]The case reached the Supreme Court after a cumbersome appellate process. Objector-intervenors appealed the certification and approval decisions, but the Fifth Circuit affirmed. Among other conclusions, the Fifth Circuit held that the settlement satisfied the rigors of Rule 23(b)(1)(B) mandatory class treatment. *In re Asbestos Litig.*, 90 F.3d 963, 982-88 (5th Cir. 1996). The Fifth Circuit denied rehearing *en banc. In re Asbestos Litig.*, 101 F.3d 368 (5th Cir. 1996). Shortly thereafter, however, the Supreme Court decided *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which assessed the propriety of Rule 23(b)(3) class treatment as to asbestos-related tort claimants. Litigants appealed the Fifth Circuit's decision in *In re Asbestos Litigation*, and the Supreme Court granted certiorari review and vacated the Fifth Circuit's judgment for further consideration in light of *Amchem. Flanagan v. Ahearn*, 521 U.S. 1114 (1997). On remand from the Supreme Court, the Fifth Circuit did not take the hint. Rather, the court of appeals re-affirmed the Eastern District of Texas and distinguished *Amchem* from the pending case because they involved Rules 23(b)(3) and 23(b)(1)(B), respectively. *In re Asbestos Litig.*, 134 F.3d 668, 669-70 (5th Cir. 1998). The Supreme Court then again granted certiorari review and reversed the Fifth Circuit. *Ortiz*, 527 U.S. at 865.

49

inadequacy of the fund to pay all the claims.  The concept driving this type of suit was insufficiency, which alone justified the limit on an early feast to avoid a later famine."  *Id.*  The Court noted that "in an action such as this[,] the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the inadequacy of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge."  *Id.* at 849. To illustrate this point, the Court approvingly cited to two Eleventh Circuit decisions: *In re Temple*, 851 F.2d 1269 (11th Cir. 1988), and *In re Dennis Greenman Securities Litigation*, 829 F.2d 1539 (11th Cir. 1987).  *Id.*  At bottom, the *Ortiz* Court held that a district court's "uncritical adoption" of the parties' representation that a fund is, indeed, limited is insufficient.  *Id.* at 848.  A court may consider settlement value "as good evidence of the maximum available if [it] can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining, unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiations."  *Id.* at 852.  The Court cautioned, however, that "no such assumption may be indulged . . . in any class action settlement with the potential for gigantic fees."  *Id.*  The Court clarified this concern: "In a strictly rational world, plaintiffs' counsel would always press for the limit of what the defense would pay.  But with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant."  *Id.* at 853 n.30.

"Second, the whole of the inadequate fund was to be devoted to the overwhelming claims. . . . The limited fund cases thus ensured that the class as a whole was given the best deal; they did not give a defendant a better deal than *seriatim* litigation would have produced."  *Id.* at 839.  A defendant's ability to "retain virtually its entire net worth" runs afoul of the limited fund rationale.

50

*Id.* at 860.  The Court noted that whether "transaction costs [such as litigation expenses] that would never have gone into a class member's pocket in the absence of settlement" may be credited as a legitimate incentive for settlement is a question left "for another day."  *Id.* at 861.  In other words, deciding whether "limited fund certification can be justified on the ground that such settlement necessarily provided funds equal to, or greater than, what might have been recovered through individual litigation factoring out transaction costs" was expressly avoided.  *Id.* at 861 n.35.

"Third, the claimants identified by a common theory of recovery were treated equitably among themselves.  The cases assume that the class will comprise everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment. . . . Once all similar claims were brought directly or by representation before the court, these antecedents of the mandatory class action presented straightforward models of equitable treatment, with the simple equity of a pro rata distribution providing the required fairness."  *Id.* at 839-40.  Importantly, "equitable treatment," for limited fund purposes, is not necessarily synonymous with "equal treatment" in the general sense – that is, a limited fund is not equitably divided merely because there are "no disparate allocation[s] of resources as between conflicting classes."  *Id.* at 857.  Rather, when diverse claimants are involved, the critical concern is whether procedures are implemented "to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves."  *Id.* at 856.  Procedural safeguards, to ensure the representative integrity of the class action, are essential to effectuate a fair division of the fund.  *Id.*

Judge Pointer, after receiving evidence and hearing testimony, made detailed and specific factual findings, all embodied in Order 47A.  First, the fund was classically "limited."  At

certification, Judge Pointer's findings stressed the fund's outer limits by concluding (1) Inamed's consolidated book value was negative $2 million and (2) absent mandatory class certification and the senior secured note holders' infusion of $31.5 million, Inamed would pursue Chapter 7 liquidation, in which case, none of the tort claimants could recover any amounts.  Finding that these representations were credible and supported by actual evidence, Judge Pointer concluded that the $31.5 million reflected the maximum payout available to the class.  Thus, Juris's claim that Judge Pointer blindly adopted the evidence is factually unsupported.

The mere fact that the senior secured note holders, as opposed to Inamed, contributed solely to the fund does not affect the finding that this was a limited fund.  Importantly, the senior secured note holders contributed $31.5 million, unencumbered by Inamed's then-outstanding liabilities.  This figure, therefore, represented the maximum value available for settling pending tort claims because Inamed's other assets existed only nominally when compared to its rapidly increasing commercial debt as well as the priority interests obtained by the senior secured note holders. *Ortiz* faulted the company's (and the insurance carriers') retention of virtually unencumbered assets, which amounted to a post-settlement windfall.  In this case, though, if Inamed had attempted to liquidate in order to raise money for the settlement, then it would have run afoul of the agreements with its senior note holders, in which they acquired a superior interest in substantially all of the company's assets. Inamed's lack of products liability insurance coverage, as well as its inability to obtain alternative lending, further restricted available capital.  For all intents and purposes, therefore, Inamed had no assets to contribute to the settlement.  Only the $31.5 million, loaned to Inamed by the note holders, was available to satisfy the tort claims.  Moreover, this is not a case where the senior secured note holders stood in a position akin to the insurance companies in *Ortiz*, and therefore, Judge Pointer

should have assessed their potential insolvency. *See Ortiz*, 527 U.S. at 852 (analyzing the outer bounds of the insurers' ability to pay). That comparison would be misplaced. In particular, the insurance companies in *Ortiz* were bound, according to the California state court's judgment, to indemnify Fibreboard for asbestos related claims. Accordingly, the solvency of the insurance companies, facing derivative liability, became relevant to the Supreme Court's analysis of whether the fund was truly limited. In this case, however, the senior secured note holders were not derivatively liable for the breast implant claims; instead, they chose to fund a mandatory settlement in order to salvage Inamed, in which they had invested substantially. Thus, the solvency of the senior secured note holders and the potential impact of unrestricted litigation is irrelevant. This is the case because the senior note holders (unlike the insurers in *Ortiz*) were not secondarily liable for breast implant claims against Inamed. Thus, here, a truly limited fund existed. *See In re Telectronics Pacing Sys.*, 221 F.3d 870, 873 (6th Cir. 2000) ("The traditional 'limited fund' is a pool of money coming from an outside source, the amount of which is not subject to manipulation by the parties.").

Alternatively, when the value of the fund is disputed, settlement may be a valid proxy for an "actual" determination of the optimum value. *Ortiz*, 527 U.S. at 851. In *Ortiz*, however, "no such assumption [could have been] indulged . . ., or probably in any class action settlement with the potential for gigantic fees." *Id.* at 852. With the Fibreboard settlement, some class lawyers negotiated side agreements whereby payout was contingent on approval of the mandatory global settlement. *Id.* These side agreements created a perverse incentive to favor the known plaintiffs, which exacerbated conflicts of interest. *Id.* at 853.

53

In this case, there simply were not conflicts like those which infected the *Ortiz* settlement. Side agreements, magnified by potentially collusive negotiations, likely precipitated the rush to settle in *Ortiz*. The Inamed Class Settlement, on the other hand, resulted from deliberate and vigorous negotiations designed to yield the maximum payout to all pending and future class claimants. The class representatives reflected the varying interests affected, and all counsel engaged in protracted settlement discussions. And unlike *Ortiz*, class counsel in this case received their fees from a separate account, funded years earlier, by a coalition of breast implant manufacturers. The division of fee and fund obviated the attorneys' incentive to acquiesce to less than favorable terms in order to obtain guaranteed, short-term payment. The same tensions that permeated the Fibreboard settlement, therefore, were simply not present in this case. Accordingly, the agreed upon settlement value can be considered persuasive evidence of the maximum value that was available to the class because, as Judge Pointer determined as a factual matter, the proposed settlement was "non-collusive and was negotiated in good faith and at arms' length by experienced and informed counsel who, after years of discovery, litigation and negotiation, fully understand the costs and risks of breast implant litigation." (Doc. #59, Order 47A ¶ 5(a)).

Additionally, the Supreme Court strongly hinted that a defendant must be on the brink of bankruptcy before limited fund treatment is appropriate:

> We need not decide here how close to insolvency a limited fund defendant must be brought as a condition of class certification. While there is no inherent conflict between a limited fund class action under Rule 23 (b)(1)(B) and the Bankruptcy Code, it is worth noting that if a limited fund certification is allowed in a situation where a company provided only a *de minimis* contribution to the ultimate settlement fund, the incentives such a resolution would provide to companies facing tort liability to engineer settlements similar to the one negotiated in this case would, in all likelihood, significantly

> undermine the protections for creditors built into the Bankruptcy
> Code.

*Id.* at 860 n.34 (citation omitted); *see also Jenkins v. Raymark Industries, Inc.*, 109 F.R.D. 269, 276

(E.D. Tex. 1985) ("Thus, unless the brink of insolvency will be reached during the litigation of the

pending 893 claims, a limited fund does not exist as to these claimants."), *aff'd*, 782 F.2d 468 (5th

Cir. 1986).  In this case, however, that Inamed was nearing insolvency is virtually undisputed.  At

the time of certification, the company had reported net operating losses for several years, its

independent auditor repeatedly had issued qualified opinions, and its consolidated book value was

negative. Further, Chapter 7 liquidation, as opposed to Chapter 11 reorganization, was imminent.

Consequently, bankruptcy was no longer merely possible – it was inevitable.  Continued litigation

without global resolution promised the demise of Inamed and ensured the annihilation of unsettled

and pending claims.[27]  According to the evidence before Judge Pointer, and on which he relied,

through bankruptcy, tort claimants would have been pitted against trade creditors, who held

liquidated claims in excess of $10 million, as to the recovery of approximately $1.4 million – the

remaining assets to be liquidated were wholly secured by the third party investors' financing

arrangements, and, therefore, those senior note holders had priority with respect to any claims against

those assets.  Although the per claimant payout under the Inamed Class Settlement was low, the

payout through bankruptcy would have been even less and likely nothing at all.

In contrast, post-*Ortiz*, the Sixth Circuit decertified a Rule 23(b)(1)(B) class action because

the risk of bankruptcy was more theoretical than real. In *In re Telectronics Pacing Systems, Inc.*, 221

---

[27]In this regard, Juris's concern that Inamed experienced a 24% increase in net sales during 1998 is unavailing. Inamed had significant financial stresses, and a single line-item improvement on its financial statements is inadequate to counterbalance nearly a decade of operational deterioration (especially in light of Inamed's rapidly ballooning debt load).  In 1998, sales were up, but financially Inamed was still on a collision course with Chapter 7.

F.3d 870 (6th Cir. 2000), which stemmed from allegedly faulty pacemakers, the parties moved for mandatory class certification pursuant to Rule 23(b)(1)(B) and settlement approval.  Importantly, the proposed settlement purported to liquidate defendant TPLC's assets (worth $75 million) while absolving its corporate parent, which at the time recognized over $5 billion in annual global sales. *Id.* at 874-86.  The Sixth Circuit, reversing the certification decision, rejected the argument that the mere threat of bankruptcy rendered TPLC "limited" within the meaning of Rule 23(b)(1)(B):

> Presumably all companies have limited funds at some point – there is always the possibility that a large mass tort action or other litigation will put a company into bankruptcy.  Should that eventually threaten, we have a comprehensive bankruptcy scheme in this country for just such an occurrence.   Simply demonstrating that there is a possibility, even a likelihood, that bankruptcy might at some point occur cannot be the basis for finding that there is a "limited fund" in an ongoing corporate concern.

*Id.* at 880.

A hypothetical risk of bankruptcy is insufficient to justify limited fund treatment, *see In re Auction Houses Antitrust Litig.*, 42 Fed. App'x 511, 521 (2d Cir. 2002) (concluding that, under *Ortiz*, speculative or theoretical inability to pay does not render a defendant "limited"), but the limited fund in this case is distinguishable.  Unlike *Telectronics*, Inamed, at the time of settlement, did not have a multi-billion dollar parent backing its operation.  TPLC's suggestion that bankruptcy was looming, therefore, was simply not credible considering its parent's deep financial resources, which the settlement placed beyond the class's reach.[28]  Accordingly, *Telectronics*, in light of *Ortiz*, is best understood as standing for a limited proposition: when a company is a going concern, the mere potential for bankruptcy in the absence of global class treatment is insufficient to render the company

---

[28]In this respect, the *Telectronics* case is therefore substantially akin to *Ortiz*, in which there were substantial insurance company assets placed out of the reach of the class by the settlement.

"limited" for purposes of Rule 23(b)(1)(B).  *See Telectronics*, 221 F.3d at 880 ("Simply demonstrating that there is a possibility, even a likelihood, that bankruptcy might at some point occur cannot be the basis for finding that there is a 'limited fund' in an *ongoing corporate* concern.") (emphasis added).

On the other hand, once bankruptcy becomes factually inevitable and fatally prejudicial to putative claimants, the  assets available for recovery are "limited."  The Eleventh Circuit has made this same observation, albeit in a case where there was not sufficient fact finding to support the legal conclusion: "This district court also found a limited fund on the basis that some investors may bankrupt potential sources of recovery.  The court made no specific findings of the defendants' financial status.  *Absent such findings* the district court could not properly rely on this ground for certification."  *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1546 (11th Cir. 1987) (citations omitted) (emphasis added).  *Dennis Greenman*, therefore, authorizes limited fund treatment when

the district court makes the requisite factual findings as to insolvency.[29]  Here, Judge Pointer did just that.

In this case, foremost, Inamed was not a going concern.  For several years preceding the settlement, its independent auditor issued a qualified opinion, which expressed reservation that the company would survive as a result of breast implant litigation.  Inamed's book value was negative $2 million, and its outstanding corporate liabilities, without regard to the tort claims or litigation expenses, vastly overshadowed its assets.  Similarly, its senior secured note holders' interests swallowed the saleable assets.  But its business woes were symptoms of a deeper problem:  Inamed was burning its reserves on seemingly bottomless litigation costs.  Indeed, the settlement's effect on the operation was uncertain at the time; given the dire situation, whether the company would rebound

---

[29]Juris relies on the Second Circuit's decision in *In re Joint Eastern & Southern District Asbestos Litigation*, 982 F.2d 721 (2d Cir. 1993), for the proposition that Rule 23(b)(1)(B) is an imperfect substitute for bankruptcy protections, which otherwise ensure compromise among competing creditors. (Doc. #288 at 21-22).  Her suggestion that the Second Circuit's analysis applies here misses the mark.  Unlike this case, the Second Circuit, considering the propriety of Rule 23(b)(1)(B) certification *directly against* an insolvent trust without the benefit of supplementary infused capital, observed that the "differences [between bankruptcy protections and the procedures in Rule 23] raise a substantial question whether a class action may be used to adjust claims against an insolvent entity that is eligible for bankruptcy protection."  982 F.2d at 736; *see also id.* ("[A]n even more substantial question is raised as to whether a class action may be used against an insolvent entity to adjust the claims of creditors vis-a-vis each other, without observing the protections that would be available under bankruptcy law."); *In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. 648, 654 ("[H]owever insolvency is defined, the Trust is deeply insolvent . . . .").  On this factual basis, the Second Circuit held that bankruptcy proceedings are superior to a limited fund class action when attempting to recover directly against an insolvent entity.  982 F.2d at 735-36.

This conclusion, however, is only tenuously related to Judge Pointer's decision.  The Inamed Settlement did not purport to liquidate Inamed, undisputedly insolvent, and resolve tort claims (and as a result, subordinate trade claims) from those proceeds.  Instead, Judge Pointer's consideration of the company's insolvency confirmed the wholly independent finding that the $31.5 million loan from the senior creditors reflected the maximum payout available to breast implant claimants.  In this sense, the class action proceeded to liquidate the $31.5 million fund (which was not "insolvent") rather than Inamed.  The Second Circuit's hesitations as to using Rule 23(b)(1)(B) to effect liquidation against an insolvent entity are plainly inapplicable.  Indeed, a careful reading of the decision reveals that the Second Circuit differentiated Rule 23(b)(1)(B) treatment *against* an insolvent entity from a situation akin to the Inamed Class Settlement: "With respect to aggregate claims in excess of a fixed sum of money, a (b)(1)(B) class action *is appropriate* to avoid an unfair preference for the early claimants at the expense of later claimants."  *Id.* at 735 (emphasis added).

post-settlement remained pure speculation.[30]  Thus, contrary to Juris's suggestion that the company's eventual sale for several million dollars in 2005 demonstrates undervaluation at settlement, the more plausible interpretation is that the company was no longer facing the crushing financial obligations, operational diversions, and contingent liability (all of which attended the implant litigation), and consequently was able to rebuild.[31]  When Inamed experienced moderate profitability in late 1998 and throughout 1999, the company attributed its slight turnaround to (1) resolution of the breast implants litigation, (2) third party financing and supervision, and (3) aggressive cost reduction. Without the continuing and uncertain litigation drain, Inamed, through significant investment support as opposed to internal reserves, equalized and reached a sustaining point.

Thus, Inamed itself had no unencumbered assets to contribute to settlement.  The $31.5 million, which it contributed, and which was procured through private lending, reflected the outer bound of total recovery for class members because of Inamed's insolvency.  Accordingly, as Judge Pointer concluded in Order 47B, "[u]nlike the situation in [*Ortiz*], there cannot be any serious dispute about this being a 'limited' fund case – indeed an extremely 'limited' fund case to the extent of providing what most claimants would view as only '*de minimis*' distributions." (Doc. #70, Order 47B at 2 n.6).

---

[30]At some level, Juris's counsel seems to acknowledge this point:

> THE COURT:    Now, [at the Fairness Hearing] nobody understood and knew that the defendant would make the financial recovery it did.  Fair?
> MS. LEBOW:    Fair.

(Doc. #287, 12/14/09 Hearing Transcript 43:7-9).

[31]Additionally, in the other cases to have considered this issue, the respective defendants had the option of pursuing mandatory class treatment or Chapter 11 reorganization.  In this case, however, Inamed's only viable option, given its financial position in the mid- to late-1990s, was straight liquidation of its assets.  The courts that have rejected Rule 23(b)(1)(B) as a substitute for bankruptcy were not confronted with the situation that the parties and Judge Pointer faced here – namely, that the tort claim creditors would have received nothing.

Responding to this conclusion, the best Juris can do is to argue that Inamed's financial status at certification was not as depressed as portrayed to Class Counsel and Judge Pointer. The court has significant doubts as to whether Juris, pursuant to Rule 60(b), may retrospectively scrutinize the propriety of class certification. This particular line of argument – that Inamed understated its financial troubles – is distinct from challenging Judge Pointer's conclusions of law based on uncontroverted factual findings. Insofar as Juris argues that Inamed essentially hoodwinked Class Counsel and the court, she questions the integrity of Judge Pointer's factual findings and, relatedly, the parties' candor in presenting evidence. The only basis under Rule 60(b) for revisiting a factual finding on this basis is its third subdivision: "[T]he court may relieve a party or its legal representative from a final judgment . . . for . . . fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." FED. R. CIV. P. 60(b)(3).

But "[t]o obtain relief from a final judgment based upon fraud under Rule 60(b)(3), the moving party must prove by *clear and convincing evidence* that the adverse party obtained the [judgment] through fraud, misrepresentations, or other misconduct. The moving party must also demonstrate that the conduct prevented them from fully presenting his case." *Waddell v. Hemerson*, 329 F.3d 1300, 1309 (11th Cir. 2003) (citing *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000)) (emphasis added). "Clear and convincing evidence" is an "intermediate standard of proof, lying somewhere between proof by a preponderance of the evidence and proof beyond a reasonable doubt." *Hornor, Townsend & Kent, Inc. v. Hamilton*, No. 01-2979, 2003 U.S. Dist. LEXIS 25967, at *31 (N.D. Ga. Sept. 29, 2003) (citation omitted); *see also United States v. Owens*, 854 F.2d 432, 436 n.8 (11th Cir. 1988) (describing the standard as proof that the "claim is highly probable").

Here, Juris's evidence that Inamed defrauded Class Counsel and Judge Pointer falls woefully below the "clear and convincing" standard of proof. First, she argues that, in its SEC filings, Inamed reported for fiscal year 1998 that its net sales (not income, but sales) increased by 24% over net sales for fiscal year 1997. According to Juris, this disclosure revealed a rosier financial picture than the one painted at class certification. This argument misses the mark. A single line-item in SEC statements, on its own, does not encapsulate the financial health of a company. This is particularly the case when the same document reveals a negative $15.6 million stockholders' equity account. Inamed, even with a 24% increase in sales, had a negative book value according to its balance sheet. Inamed's enormous debt load substantially counterbalanced a short-term turnaround in sales.

Similarly, Juris argues that, when Inamed filed its 10-K in 2000 for fiscal year 1999, the net sales increased 44% as compared to fiscal year 1998. (Doc. #254-8, 1999 Inamed 10-K at 4). In the same document, the company also revealed that its stockholders' equity account equaled $134.1 million at year-end 1999, as compared to negative $15.6 million at year-end 1998. (Doc. #254-8, 1999 Inamed 10-K at 5). At first blush, these numbers seem troubling in light of the representations at certification. But the devil is in the details, and upon closer analysis three facts allay any such concern. First, the 1999 10-K reports Inamed's financial position as of December 31, 1999. That type of accounting snapshot does not reveal fraud ten months earlier at certification. Second, in April 1998, once Judge Pointer provisionally certified and conditionally approved the Inamed Settlement Agreement, he enjoined (1) all litigation against Inamed and brought by members of the then-putative class and (2) Inamed from settling any cases outside the putative class resolution. (Doc. #10, Order 47 ¶ 8(a)-(b)). The financial impact of these injunctions is incalculable, but considering Inamed's enormous litigation expenses, of which Judge Pointer had been aware, it is not

61

surprising that the company's financial position quickly and dramatically improved when it was no longer saddled with unending, non-operational costs.  Third, Inamed candidly attributed its positive net worth and overall turnaround to three factors: (1) third party financing; (2) aggressive reduction efforts in non-core expenses; and (3) public equity placements.

Most significantly, however, Juris's arguments ignore one essential point.  If Inamed had not resolved the breast implant cases on a global scale, then the company was destined for liquidation at the direction of its senior secured creditors – a fact which Juris has never disputed.[32]  By settling the cases (and thus eliminating enormous litigation expense and liability), the senior creditors were willing to lift the restrictions on equity placements and, correspondingly, were more willing to further infuse Inamed with capital.  These financing options existed because of the settlement; any reasonable investor would not have been willing to finance an operation with over 40,000 contingent tort liabilities, a portion of which had already yielded multimillion dollar jury verdicts.  In short, Juris's argument is fatally flawed because it is circular: Inamed rebounded because of the Inamed Settlement Class, and because Inamed rebounded, the Inamed Settlement Class was flawed.  To be sure, Inamed financially recovered.  But the undisputed evidence is that the company recovered solely because its financial backers were willing to salvage the company, and they were only willing to do that if the breast implant litigation was completely resolved.  The conclusion, therefore, remains: at certification, Inamed's assets were wholly encumbered, and there was substantial uncertainty as to the company's continued viability.  Merely because the company reported progress

---

[32]Juris's counsel attempts to dispute this evidence by questioning the credibility of Class Counsel's financial advisor, Ernst & Young.  (Doc. #287, 12/14/09 Hearing Transcript 28:11-24).  The court addresses this concern below.

– even substantial progress – after global resolution of its breast implant litigation does not demonstrate by "clear and convincing" evidence that Inamed defrauded the court or Class Counsel.

Moreover, Juris wrongly indicts key expert testimony on which Judge Pointer relied. Juris argues that Judge Pointer erroneously based his insolvency conclusions on testimony from Alan Jacobs, an Ernst & Young partner, solely because Inamed paid for his services. According to Juris's counsel, "that fact was [not] disclosed, certainly not to the class. I don't believe it was disclosed to Judge Pointer." (Doc. #287, 12/14/09 Hearing Transcript 28:22-24). Class Counsel, however, explained that Inamed's payment for Ernst & Young's services was actually for the benefit of the class:

> We negotiated with [Inamed] to pay [Ernst & Young]. Why should we have to pay if we had to come forward with evidence that Inamed was in such dire straits that [it] couldn't meet [its] obligations. We wanted them to have to pay our financial advisor. Yes, we did have the means to pay it through the common benefit fund that Your Honor is familiar with, but we didn't want to deplete the assets of that fund to pay for a financial advisor. So we negotiated with Inamed that [it] would pay it.

(Doc. #287, 12/14/09 Hearing Trans. 81:10-18).

In addition, as Class Counsel has noted, this agreement was not the clandestine arrangement that Juris suggests, but rather was aboveboard and known to the class as well as the court. (Doc. #287, 12/14/09 Hearing Transcript 80:19-24). This is confirmed by a simple review of the Settlement Agreement's terms: "Within 60 days after Preliminary Approval, Inamed agrees to pay to Ernst & Young ('E&Y') $150,000 in lieu of all fees and expenses of E&Y for services rendered to Settlement Class Counsel." Inamed Settlement Agreement IV.C.3, *available at* http://www.fjc.gov/BREIMLIT/ORDERS/inasett.rtf (last visited May 6, 2010). Inamed and Class

Counsel presented the Settlement Agreement to Judge Pointer, he no doubt read it, and its terms were certainly available for review by any interested party.

Nor is it a great surprise that Class Counsel selected Jacobs to do the analysis.  He "was the tort claimant committee's financial advisor in the Dow Corning bankruptcy." (Doc. #287, 12/14/09 Hearing Transcript 81:2-3).  According to Class Counsel, Ernst & Young, and Jacobs in particular, "was a natural fit . . . to help . . . with this other implant manufacturer as almost part and parcel of work [the firm was] doing and getting paid millions and millions of dollars to do in connection with the Dow bankruptcy." (Doc. #287, 12/14/09 Hearing Transcript 81:4-9).  Indeed, "[s]ince 1994, E&Y had served as a financial advisor to the Settlement Class Counsel for the Global Settlement of the Silicone Gel Breast Implants Products Liability Litigation pending in the United States District Court for the Northern District of Alabama. . . . In that role, E&Y's responsibilities . . . included . . . coordinating the preparation of reports to the Settlement Class Counsel . . . ." (Doc. #269-4, Jacobs Aff. ¶ 2).[33]

It is clear, therefore, that Class Counsel purposefully and reasonably retained Ernst & Young and Jacobs, and the firm's services required payment, either by Class Counsel or Inamed.  Given Ernst & Young's longstanding relationship with Class Counsel, the mere fact that Class Counsel negotiated for the firm's services to be compensated by Inamed does not cast doubt on the veracity of its conclusions.  Juris's speculative contention that Ernst & Young presumably dropped its independence in favor of underhanded favoritism toward Inamed is without any factual support.

---

[33]Juris similarly attempts to create a specter of fraud by submitting a newspaper article, which briefly references Inamed's accounting irregularities for fiscal years 1996 and 1997.  (Doc. #293-1, Exhibit A at 2).  A settlement with the SEC, which did not admit or deny accounting guilt, is not "clear and convincing" evidence that the data on which Judge Pointer relied was fraudulent – especially considering that an external accounting firm, Ernst & Young, independently reviewed Inamed's financial statements and prepared the documentation submitted for class certification.

Critically, the origin of payment – particularly in light of the facts leading up to it – is not "clear and convincing" evidence that Ernst & Young's financial conclusions regarding Inamed's insolvency were fraudulent and deceptive. This is especially the case considering that Class Counsel, *after* having retained Ernst & Young, negotiated with Inamed to cover the costs, which Ernst & Young received *after* provisional class certification. This conclusion is bolstered by the fact that Judge Pointer was aware of this arrangement. It was conspicuously included in the Settlement Agreement (to which all class members had and have access), and which was approved as fair, adequate, and reasonable.

The Inamed Settlement, therefore, reflected the maximum available payout to current and future claimants, and according to the agreement, the whole fund was earmarked exclusively for the class. Relatedly, Juris has never denied that the outstanding tort claims vastly exceeded the $31.5 million fund. In this regard, the Inamed Settlement satisfied the first and second guideposts marked by *Ortiz*. *See Ortiz*, 527 U.S. at 838 ("[T]he totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims."); *id.* at 839 ("[T]he whole of the inadequate fund was to be devoted to the overwhelming claims."). The only remaining issue is whether Judge Pointer's Order 47B, which determined the distribution plan, equitably treated the claimants. *See id.* at 839-40.

The *Ortiz* Court concluded that the equal, pro rata distribution of the Fibreboard Settlement Fund was inequitable:

> [T]he class included those exposed to Fibreboard's asbestos products before and after 1959. The date is significant, for that year saw the expiration of Fibreboard's insurance policy with Continental, the one which provided the bulk of the insurance funds for the settlement. Pre-1959 claimants accordingly had more valuable claims

> than post-1959 claimants, the consequence of being [another]
> instance of disparate of disparate interests within the certified class.
>
> . . . .
>
> The settlement decides that the claims of the immediately
> injured deserve no provisions more favorable than the more
> speculative claims of those projected to have future injuries, and that
> liability subject to indemnification is no different from liability with
> no indemnification.  The very decision to treat them all the same is
> itself an allocation decision with results almost certainly different
> from the results that those with immediate injuries or claims of
> indemnified liability would have chosen.

*Ortiz*, 527 U.S. at 857 (internal citation omitted).  But this case is not *Ortiz*.  Here, the equal payout

was the fairest distribution method for two reasons.  First, Judge Pointer concluded that differential

payouts would have required significant processing costs – administrative expenses which would

have been charged against the Settlement Fund and, accordingly, would have reduced claimants'

individual recovery.  (Doc. #70, Order 47B at 3-5).  Second, Judge Pointer, responding to class

members' objections requesting graduated payment schedules, concluded that a sliding scale would

have been inconsequential: "This fund is . . . so severely limited in relation to the number of potential

claimants that such a plan – with its substantially increased administrative costs – would not greatly

increase the amount of distribution to those determined to be eligible for enhanced benefits and

would, of course, decrease even more the meager distributions to other claims members." (Doc. #70,

Order 47B at 5).  Thus, unlike *Ortiz*, which involved a multibillion dollar settlement and a

comparable number of claimants as the Inamed Class, the limited availability of money here

necessitated an equal distribution to fairly apportion the Settlement Fund among the diverse class

members.  To the extent that the settlement differentiated between present and future claimants, the

differential would have been ultimately *de minimis*; accordingly, Judge Pointer correctly approved the distribution plan.

### C.     Relevant Due Process and Personal Jurisdiction Standards[34]

In *Phillips Petroleum Co. v. Shutts*, the Supreme Court addressed the contours of personal jurisdiction over absent, non-resident class members in a state court class action involving damages claims. 472 U.S. 797, 811-12 (1985). As a general matter, the Court concluded that "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Id.* at 811. The Court identified three procedural safeguards necessary to secure personal jurisdiction over absent class members. *Id.* at 812. First, the absent class-action plaintiff "must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable . . . ." *Id.* Second, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* "Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.*

Importantly, the Court limited the scope of *Shutts* only "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." *Id.* at 812 n.3. By circumscribing the scope of its holding, the Court "intimate[d] no view concerning other

---

[34]To the extent that Juris's argument challenges due process and, relatedly, personal jurisdiction, it falls within Rule 60(b)'s subdivision (4), which authorizes relief when "the judgment is void." *See Burke v. Smith*, 252 F.3d 1260, 1263 (11th Cir. 2001) ("Generally, a judgment is void under Rule 60(b)(4) if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.") (citation and internal quotation marks omitted).

types of class actions, such as those seeking equitable relief." *Id.* Important to the present case, the lower federal courts, post-*Shutts*, have divided as to whether this carve-out applies to Rule 23(b)(1)(B) limited fund class actions. Since *Shutts*, three cases have presented the Supreme Court with the opportunity to resolve this issue; however, each time, the Supreme Court has declined to resolve the uncertainty. The following chronicles these attempts.

First, in *In re Real Estate Title & Settlement Services Antitrust Litigation*, the Third Circuit reviewed directly the district court's anti-suit injunction and collaterally the decision to certify a mandatory Rule 23(b)(1) and (b)(2) class action. 869 F.2d 760, 763-64 (3d Cir. 1989). The Third Circuit acknowledged that, when a class action is certified pursuant to Rule 23(b)(1) or Rule 23(b)(2), the action is not "wholly or predominately" for money damages in the *Shutts* sense even if it effectively forecloses substantial damage claims; rather, the case is equitable in nature, which requires distinct procedural considerations. *Id.* at 768. The Third Circuit, however, expressly tabled analysis of "due process requirements in a class action certified under Rule 23(b)(1) in which there is only a limited common fund from which the plaintiffs can obtain relief." *Id.* at 768 n.8. *Shutts*, according to the Third Circuit and based on the Supreme Court's careful qualification, does not control when a class action is properly certified pursuant to Rule 23(b)(1) or Rule 23(b)(2). The Supreme Court denied certiorari review. *Chicago Title Ins. Co. v. Tuscon Unified Sch. Dist.*, 493 U.S. 821 (1989).

Five years later, the Ninth Circuit partially endorsed the Third Circuit's interpretation of *Shutts* insofar as it concerned equitable relief. In *Brown v. Ticor Title Insurance Co.*, the Ninth Circuit considered a collateral challenge to the same class settlement involved with the *Real Estate Title* litigation. 982 F.2d 386, 388 (9th Cir. 1992). The court concluded that a hybrid case, involving

68

both equitable relief and damage claims, requires application of *Shutts* insofar as the damage claims are involved; specifically, class members must be afforded the opportunity to opt out, even as to an otherwise mandatory action, to the extent that damage claims are bundled with purely equitable relief. *Id.* at 392. The Ninth Circuit, therefore, concluded that claims retain their legal or equitable qualities despite the basis for certification. *See id.*

After the Ninth Circuit's decision, the Supreme Court granted a writ of certiorari as to the following question: "[W]hether a federal court may refuse to enforce a prior federal class action judgment, properly certified under Rule 23, on grounds that absent class members have a constitutional due process right to opt out of any class action which asserts monetary claims on their behalf." *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 120-21 (1994). After granting certiorari, however, the Court dismissed the writ as improvidently granted and avoided deciding the general applicability of *Shutts* to mandatory class actions. *Id.* at 118.

In *In re Asbestos Litigation*, the Fifth Circuit considered the applicability of *Shutts* to mandatory, limited fund class actions certified pursuant to Rule 23(b)(1)(B). 90 F.3d 963, 986-87 (5th Cir. 1996). The Fifth Circuit, affirming the district court's certification of a mandatory class action and approval of the settlement regarding asbestos related injuries, concluded that "[t]he limitation of *Shutts* to claims of known plaintiffs that are predominately for money damages forecloses application of its holding to 23(b)(1)(B) actions which have always been equitable and often involve unknown plaintiffs." *Id.* at 986 (citation omitted). The Fifth Circuit elaborated: "Limited-fund class actions effect a pro-rata reduction of all claims in order to treat all claimants fairly. Thus, they sound in equity even though the relief they provide necessarily affects the amount of money damages that claimants can ultimately receive." *Id.* (citations omitted). Accordingly, the

Fifth Circuit reasoned that adequacy of representation, as delineated in *Hansberry v. Lee*, 311 U.S. 32 (1940), is the exclusive test for due process and, correspondingly, personal jurisdiction in an equitable proceeding under Rule 23(b)(1)(B) even if personal injury claims are released. *Id.*

The Supreme Court granted certiorari and reversed the Fifth Circuit. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999). Importantly, the Supreme Court had the opportunity to address the Fifth Circuit's constitutional analysis as described above, but *Ortiz* narrowly evaluated only the substantive requirements embedded in Rule 23(b)(1)(B): "We hold that applicants for contested certification on [a limited fund rationale] must show that the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members." *Id.*; *see also id.* at 830 ("The nub of this case is the certification of the class under Rule 23(b)(1)(B) on a limited fund rationale . . . .").

Although generally considering the Seventh Amendment, the Rules Enabling Act, and *Shutts*, the Court included those references as "counsel against leniency in recognizing mandatory limited fund actions in circumstances markedly different from the traditional paradigm." *Id.* at 864; *see also id.* at 842 ("[T]his limiting construction [as to Rule 23(b)(1)(B)] . . . avoids serious constitutional concerns raised by the mandatory class resolution of individual legal claims, especially where a case seeks to resolve future liability in a settlement-only action."). In other words, the Court acknowledged that certifying a mandatory limited fund settlement as to unliquidated tort claims may raise constitutional concerns but did not in any way actually decide that issue. Rather, it resolved the appeal on a construction of Rule 23(b)(1)(B) instead of due process. Its analysis, therefore, stopped short of reaching the ultimate issue: whether and under what circumstances mandatory class members have a constitutional right to opt out. As the Court observed, "[u]nlike Rule 23(b)(3) class

70

members, objectors to the collectivism of a mandatory subdivision (b)(1)(B) action have no inherent right to abstain.  The legal rights of absent class members (which in a class like this one would include claimants who by definition may be unidentifiable when the class is certified) are resolved regardless either of their consent, or, in a class with objectors, their express wish to the contrary." *Id.* at 846-47.

If anything, it could be argued that the Supreme Court concluded by implication that, if the conditions precedent to Rule 23(b)(1)(B) certification are satisfied, then the class members have no right – constitutional or otherwise – to opt out of the settlement.  *See Ortiz*, 527 U.S. at 842.  But a more accurate reading of the opinion reveals that the decision hinged only on an analysis of Rule 23 without overlaying constitutional guidelines.  Thus, the Fifth Circuit's due process conclusion that (1) Rule 23(b)(1)(B) class members have no right to opt out under *Shutts* and, relatedly, (2) adequacy of representation is the proxy for personal jurisdiction in limited fund cases "was not disturbed by the Supreme Court [because] the case was reversed on other grounds."  4 NEWBERG ON CLASS ACTIONS § 13:34 (4th ed. 2009).  Indeed, the Court did "not rule[] out the possibility under the present Rule of a *mandatory* class to deal with mass tort litigation on a limited fund rationale . . . ." *Ortiz*, 527 U.S. at 862 (emphasis added).  Juris's contention that, by quoting *Shutts*, the *Ortiz* Court extended opt-out requirements to Rule 23(b)(1)(B) class actions is plainly unsupported; rather, the Court cautiously avoided any decision as to that matter.[35]

---

[35]Juris's counsel eventually accepted this conclusion at the December 14, 2009 hearing:

| THE COURT: | Was *Ortiz* decided on in personam jurisdiction?  No, it wasn't decided on that point. |
|---|---|
| MR. WHATLEY: | *It wasn't Your Honor*.  It was decided based on the fact that it said you really can't use Rule 23(b)(1)(B) for this kind of settlement. |

Based on this history, two points are relevant here. First, there is a critical distinction between the text of Rule 23 and ancillary constitutional protections (that, of course, trump). In *Ortiz*, for example, without intimating its view regarding a class member's purported right to opt out, the Supreme Court noted that the text of Rule 23 does not afford such a right. *Ortiz*, 527 U.S. at 846-47. A plain application of the Rule, without considering adequacy of representation or similar constitutional mandates, precludes an absent class member's ability to abstain from the approved mandatory settlement. As explained more fully above, the Inamed Settlement Class satisfied the rigors of Rule 23(b)(1)(B) as outlined in *Ortiz*; accordingly, Rule 23, standing on its own, disposes of Juris's claim to exclusion. Second, and more importantly, the applicability of *Shutts* to a limited fund class action is unsettled – at least by the Supreme Court. *See* 2 NEWBERG ON CLASS ACTIONS § 4.9 (4th ed. 2009) ("The debate about whether class members have the right to opt out of a Rule 23(b)(1)(B) action has generated divergent views by the courts and academic communities.").

Attempting to answer the constitutional question, the Circuit Courts have splintered regarding the right to opt out of a limited fund class action. As mentioned, the Ninth Circuit held that *Shutts* applies when the mandatory class action forecloses damage claims notwithstanding certification under a limited fund theory. *Ticor Title Ins.*, 982 F.2d at 392. More precisely, the *Ticor Title* approach eliminates application of claim preclusion as a defense to an absent class member's subsequently filed lawsuit covering the same subject matter as the mandatory class action. *Id.*

To the contrary, the Fifth Circuit held that *Shutts* is inapplicable and, in fact, absent class members are precluded from opting out. *Asbestos Litig.*, 90 F.3d at 986-87. Similarly, the Sixth and Seventh Circuits reasoned that, after *Ortiz*, courts must rigidly police the requirements under Rule

_____

(Doc. #287, 12/14/09 Hearing Transcript 102:1-5) (emphasis added).

23(b)(1)(B) precisely because class members lack the right to abstain from the litigation. *In re Teletronics Pacing Sys.*, 221 F.3d 870, 881 (6th Cir. 2000); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir. 1999) ("[The right to opt out] may be overcome only when individual suits would confound the interest of other plaintiffs – when, for example, there is a limited fund that must be distributed ratably, the domain of Rule 23(b)(1) . . . ."); *see In re Jackson Lockdown/MCO Cases*, 107 F.R.D. 703, 714 (E.D. Mich. 1985) ("The Supreme Court [in *Shutts*] did not reach the issue of what process is due for monetary claimants to a limited fund, at least in federal court. Thus, the opinion did not invalidate [Rule 23(b)(1)(B)] either."); *see also* 7AA FEDERAL PRACTICE & PROCEDURE – CIVIL § 1789.1 (3d ed. 2010) ("Further, some courts have concluded that the *Shutts* criteria do not apply to a Rule 23(b)(1) action seeking damages from a limited fund, but are restricted to the common-question damage action under Rule 23(b)(3) in which the class members are linked together only by common questions and may have individual interests necessitating additional protection.").

Without referencing *Shutts*, the Second Circuit has reached a middle ground and authorized its district courts to exercise their discretion when petitioned with an exclusion request in a mandatory class action. *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1303-05 (2d Cir. 1990). *But see In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 777-78 (2d Cir. 1996) (concluding that *Shutts* is inapplicable to Rule 23(b)(1)(B) class actions); *Messier v. Southbury Training Sch.*, 183 F.R.D. 350, 353 (D. Conn. 1998) (concluding, based on *Shutts*, that with claims "wholly or predominately for money judgments, due process requires that absent plaintiffs receive notice and an opportunity to opt out, even in actions certified under (b)(1) or (b)(2)"). The D.C. Circuit followed *Suffolk* and held that "the language of Rule 23 is sufficiently flexible to afford

district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions." *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997). Cabining this discretion, however, the D.C. Circuit instructed that "[a]lthough as a general matter, courts should not permit opt-outs when doing so would undermine the policies behind (b)(1) or (b)(2) certification, where both injunctive and monetary relief are sought, the need to protect the rights of individual class members may necessitate procedural protections beyond those ordinarily provided under (b)(1) and (b)(2)." *Id.* at 94-95.

The Third Circuit has expressly avoided the issue, *Real Estate Title*, 869 F.2d at 768 n.8, but the Eastern District of Pennsylvania in *In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158, 180-81 (E.D. Pa. 1997), adopted the Fifth Circuit's analysis in *In re Asbestos Litigation*, 90 F.3d at 986-87. Likewise, the Fourth Circuit sidestepped the interplay between *Shutts* and Rule 23(b)(1)(B) and decided an appeal on firmer ground. *In re A.H. Robbins Co.*, 880 F.2d 709, 745 (4th Cir. 1989) ("Fortunately, however, *Shutts* – if taken as requiring an opt-out provision in any class certification, and assuming without deciding, that opt-out could not be validated here under the *Mathews v. Eldridge* standard – is satisfied in this case.").

Indeed, the Eleventh Circuit has not decisively analyzed the effect of *Shutts* on Rule 23(b)(1)(B). The court nearly reached the issue in *In re Temple*, 851 F.2d 1269 (11th Cir. 1988), which reviewed the Northern District of Georgia's certification of a Rule 23(b)(1)(B) class action. In *Temple*, the limited fund class action included all present and future asbestos-related personal injury actions against the defendant. *Id.* at 1270. The Eleventh Circuit granted the petitioners' writ of mandamus and ordered the district court to vacate its certification order. *Id.* Among other reasons, the district court had failed to direct notice to any class member, and as a result, the certification process was fatally non-adversarial. *Id.* at 1272-73. In a footnote, however, the

Eleventh Circuit acknowledged *Shutts* and its potential impact on limited fund actions: "The petitioners may also have the right to opt out of even a mandatory class action where the predominant issue is money damages. . . . A literal reading of *Shutts* would provide another basis for vacating the district court's order.  However, no federal appellate court has yet so held, and we need not reach this issue in the present case."  *Id.* at 1272 n.5.  This observation, although perhaps cautionary, is mere *dictum*.

On remand from the Eleventh Circuit, the Northern District of Georgia reassessed the propriety of certifying a mandatory limited fund class action.  *Waldon v. Raymark Indus., Inc.*, 124 F.R.D. 235, 236 (N.D. Ga. 1989).  Despite the parties' efforts at curing the defects identified by the Eleventh Circuit, the Northern District of Georgia, nevertheless, refused to certify the class action on constitutional grounds.  *Id.* at 237-38.  The court, referencing *Shutts* yet conceding that it is "not directly on point," concluded that "a mandatory class action would violate the constitutional rights of those persons who have insufficient contacts to allow the court to exercise personal jurisdiction over them."  *Id.* at 238.  In other words, the court reasoned that, even if Rule 23 authorizes the certification, the Due Process Clause limits the reach of a limited fund class action involving tort claims only to those class members who have minimum contacts with the forum or otherwise satisfy personal jurisdiction.  *See id.*  The Northern District of Georgia, therefore, rejected the Eleventh Circuit's footnoted suggestion:

> The idea of a mandatory class with opt out rights, besides being oxymoronic, is contrary to the very purpose for which a Rule 23(b)(1)(B) class action is meant to serve.  A Rule 23(b)(1)(B) class action is designed to preserve the limited fund for the entire class against the individual claims of class members prosecuted through separate suits.  Allowing plaintiffs to opt out of a Rule 23(b)(1)(B) class action would defeat this purpose.

*Id.* at 238 n.1.  The *Raymark* approach renders constitutional considerations relevant only at the certification decision.  *See* 5 MOORE'S FEDERAL PRACTICE – CIVIL § 23.42 ("Some courts have simply refused to certify class actions in which Due Process demands opt out rights but Rule 23 does not authorize them.").  Under such an analysis, if the claims approximate the sort of relief contemplated by *Shutts*, then the court should refuse certification of a mandatory class action.  But as the court clarified in response to the Eleventh Circuit's footnote, this consideration must precede the certification decision; otherwise, opting out would be counterproductive in light of Rule 23(b)(1)(B)'s function.  *Raymark*, 124 F.R.D. at 238 n.1.

In short, the applicability of *Shutts* to Rule 23(b)(1)(B) class actions is far from settled by the Supreme Court or the Circuit Courts, including the Eleventh Circuit.  Some decisions have pointed toward a constitutional right to opt out while others have reached the contrary conclusion.  But the decisions, such as *Ticor Title* and *Raymark*, recognizing a constitutional right to abstain, assume that Rule 23(b)(1)(B) limited fund cases, including those purporting to settle unliquidated tort claims, involve claims "wholly or predominately" for money judgments.  In a truly limited fund scenario, however, that assumption is mistaken.  When a court certifies damage claims under Rule 23(b)(1)(B), the class invokes "the equitable powers of a court to fairly apportion money damages among all claimants and, therefore, [does] not fall within the general prohibition against certification of money-damage actions under Rule 23(b)(1)(B)." 5 MOORE'S FEDERAL PRACTICE – CIVIL § 23.42.  That is, even though the class relief may involve exclusively or predominately money damages, in a properly certified Rule 23(b)(1)(B) limited fund class action, the claims are nevertheless equitable

in nature.[36]  In this case, and as discussed more fully above, the settlement represented a classically limited fund – its existence exclusively reserved for resolving outstanding tort claims and wholly dependent on the court's certification of a mandatory class.

Division of this fund, which reflected the maximum aggregate payout available for resolving breast implant claims, closely approximated the distribution of trust assets, *see In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 777-78 (2d Cir. 1996) ("[T]he present action, though it ultimately will affect the amount of damages that each member of the plaintiff class will be entitled to receive, is not an action for money damages but is rather an action in equity for the restructuring of the Trust."), or the adjudication of creditors' claims against an insolvent debtor, *see* Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 HARV. L. REV. 356, 388-89 ("[A]n action by one of a numerous group of claimants attacking a fund insufficient to satisfy the demands of all claimants may illustrate that impairment of the ability of other members to protect their rights in the fund, which suggests that the class-action device should be put to work.").  At bottom, this case, like other true limited fund cases, required the unitary and exclusive division of an asset (*i.e.*, the settlement fund) to which thousands of claimants were

---

[36]This conclusion is buttressed by examining the historical antecedents of the modern day limited fund class action.  The Advisory Committee non-exhaustively identified the following examples of limited fund cases necessitating mandatory aggregation: "an action by policy holders against a fraternal benefit association attacking a financial reorganization of the society," "an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders," "actions by the corporation for corresponding declarations of rights," and "an action by a creditor to set aside a fraudulent conveyance by the debtor and to appropriate the property to his claim, when the debtor's assets are insufficient to pay all creditors' claims."  FED. R. CIV. P. 23 Advisory Committee Note (1966 Amendments).  Ordinarily, these claims, if successful, would result in money judgments.  For example, fixing creditors' rights in a debtor's fraudulent conveyance is a distinctly legal basis for relief – that is, a creditor has a legal right to recover the money owed by the debtor.  But the rule that proceeded from the recommendations of the Advisory Committee, which withholds a right to opt out, demonstrates the point that limited fund class treatment converts an otherwise legal claim into equitable relief.  Thus, it is not the characteristic of the claim, but rather how the claim is properly characterized in the context of limited fund division, that determines whether *Shutts* applies.

entitled, and the aggregate of these claims, based on the evidence before Judge Pointer at certification, vastly exceeded the asset's total value.  Given its equitable nature, therefore, the process was sufficiently removed from the scope of *Shutts* and its associated due process requirements.  *See Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. at 180 ("Limited fund class actions 'sound in equity even though the relief they provide necessarily affects the amount of money damages that claimants can ultimately receive.' . . . Therefore, *Shutts* does not prohibit mandatory class certification under Rule 23(b)(1)(B) which is purely equitable in nature.") (quoting *Asbestos Litig.*, 90 F.3d at 986).

Of course, even though *Shutts* does not compel mandatory opt out rights, Rule 23(b)(1)(B) class members are entitled to procedural safeguards.  But the process due under *Shutts* is not coextensive with the process due in a limited fund case.  *See generally Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.") (citation omitted).  Indeed, as to class members with causes of action for money judgments against a defendant capable of surviving non-aggregate litigation,[37] the right to opt out is a workable compromise when class members are dissatisfied with settlement proposals.  Against a limited fund, on the other hand, the same dynamics are plainly inapplicable.  As the Sixth

---

[37]The court is mindful that every civil defendant, at some level, has fixed assets perhaps incapable of withstanding numerous high-magnitude judgments instead of a class action settlement and the attendant global peace.  As the Sixth Circuit explained, "[p]resumably all companies have limited funds at some point – there is always the possibility that a large mass tort action or other litigation will put a company into bankruptcy." *Telectronics*, 221 F.3d at 880.  In this regard, "[t]he district court cannot discharge the debt in advance of the occurrence [of insolvency], thereby usurping the bankruptcy scheme through settlement, even [if] it believes such an avenue to be in the best interests of most of the plaintiffs." *Id.* (citation omitted).

This case, however, does not require imprecise or indeterminate line-drawing as to whether a defendant's assets are sufficiently fixed or its operation is indeed insolvent; here, Inamed's assets were negative at certification, and only through third party financing did the settlement fund even exist.  To the extent that Inamed held assets at certification, they were wholly encumbered and effectively unreachable by the breast implant claimants.  Accordingly, the applicability of limited fund treatment to a financially healthy company's outer limits, based on market capitalization, book value, or some other valuation method, is simply not implicated by Judge Pointer's certification decision.

Circuit explained, "[f]rom a due process point of view, the opt-out choice is of less concern when there is a definite fund or *res* from which plaintiffs will receive damages. When there is a true limited fund, the only question is how to divide up the pie. Where defendants have sufficient funds to compensate class members through individual litigation, however, . . ., the choice to opt out becomes much more meaningful and due process demands that class members be afforded that right where possible." *Telectronics*, 221 F.3d at 881; *see also Ortiz*, 527 U.S. at 841 n.18 ("[W]here a case presents a limited fund, 'it is impossible to make a fair distribution of the fund . . . to all members of the multitude except in a single proceeding where the claim of each can be adjudicated with due reference to the claims of the rest. The fund . . . is like a mince pie, which can not be satisfactorily divided until the carver counts the number of persons at the table.'") (quoting Zechariah Chafee, *Bills of Peace with Multiple Parties*, 45 HARV. L. REV. 1297, 1311 (1932)).

Accordingly, by definition, a properly certified limited fund class action presupposes *seriatim* litigation. Class action treatment in this context, therefore, eliminates the incentive for "an unseemly race to the courtroom door with monetary prizes for a few winners and worthless judgments for the rest." *Coburn v. 4-R Corp.*, 77 F.R.D. 43, 45 (D. Ky. 1977); *see also Ortiz*, 527 U.S. at 838 ("The concept driving [limited fund treatment] was insufficiency, which alone justified the limit on an early feast to avoid a later famine."). Indeed, Rule 23(b)(1)(B) covers "situations where the judgment in a nonclass action by or against individual members of the class, while not technically concluding the other members, might do so as a practical matter." FED. R. CIV. P. 23 Advisory Committee Note (1966 Amendment). Consequently, only if the fund is secured in a single court, which remains wholly responsible for its equitable division, does the fair treatment of all affected parties become possible. Permitting opt outs would undercut the court's ability to fairly apportion the fund among

its claimants and would thwart the efficacy of limited fund class treatment. The necessity of limited fund treatment transforms otherwise legal claims into equitable claims. *See Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d at 777-78 ("[T]he present action, though it ultimately will affect the amount of damages that each member of the plaintiff class will be entitled to receive, is not an action for money damages but is rather an action in equity for the restructuring of the Trust.") (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 735 (2d Cir. 1992)); *see also* 5 MOORE'S FEDERAL PRACTICE – CIVIL § 23.42 (2009) ("Although limited fund cases involve money claims, they nevertheless are considered to be equitable in nature."); 1 NEWBERG ON CLASS ACTIONS § 1:9 (4th ed. 2009) (tracing Rule 23(b)(1)(B)'s origins to the compulsory joinder rule developed by the English courts of equity and this country's Federal Equity Rule 48, codified in 1842).

The particular facts of this case amplify these considerations. The $31.5 million, advanced by Inamed's senior creditors, reflected the maximum available payout for breast implant litigants. If Judge Pointer had authorized particular swatches of class members, such as the manifested injury claimants, to opt out, then only a handful of successful lawsuits would have depleted the fund,[38] especially given the high-magnitude jury verdicts reached in similar cases and the enormous transactional expenses associated with defending those cases. Such an arrangement would have rewarded only the very few litigants who removed themselves and had the first opportunity to exploit the most expeditious judicial forum for trial. Accordingly, because the $31.5 million fell woefully below the aggregate sum of claims pending against Inamed, non-aggregate litigation would have

---

[38]This, of course, assumes that the fund would have existed under such circumstances. In fact, the senior secured note holders would have withdrawn the fund altogether and forced Inamed into liquidation if Judge Pointer had granted exclusion requests. (Doc. #269-5, Decl. of Class Counsel ¶ 6). The $31.5 million existed only because the court certified the class pursuant to Rule 23(b)(1)(B) and would not have been available in the absence of such certification.

been "dispositive of the interests of the other members not parties to the individual adjudications." FED. R. CIV. P. 23(b)(1)(B); *see also* discussion *supra* Part III.C (concluding that Order 47A either is un-reviewable as to its limited fund conclusion or satisfies *Ortiz*).

At bottom, therefore, *Shutts* does not compel the conclusion that Juris is entitled to abstain from the Inamed Class Settlement because claims against a limited fund are equitable in nature – they are not claims "wholly or predominately for money judgments."  And in light of the purposes served through Rule 23(b)(1)(B) class certification, the court concludes that due process does not require a right to exclusion.[39]  Rewriting Rule 23(b)(1)(B) and supplying a right to opt out would render that particular class mechanism wholly ineffectual.

As a general matter, a properly certified class action, attended by the requisite due process safeguards embedded in and concretized by Rule 23, authorizes the exercise of personal jurisdiction over absent class members.  *See Bayshore Ford Trucks Sales, Inc. v. Ford Motor Co.*, 471 F.3d 1233, 1245 (11th Cir. 2006) ("The granting of class certification under Rule 23 authorizes a district court to exercise personal jurisdiction over unnamed class members who otherwise might be immune to the court's power.").  The Due Process Clause mandates, at a minimum, that absent limited fund class members be adequately represented in order for them to be bound by the judgment.  *See Asbestos Litig.*, 90 F.3d at 986-87, *rev'd on other grounds sub nom. Ortiz*, 527 U.S. at 865; *Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. at 180; *see also Hansberry v. Lee*, 311 U.S. 32, 42 (1940) (In an equitable proceeding, "there has been a failure of due process only in those cases where it cannot be said that the procedure adopted[] fairly insures the protection of the interests of

---

[39]To be clear, the court reaches this conclusion only because the Inamed Class Settlement presented a truly limited fund scenario.  If a purportedly limited fund is actually not "limited" in the *Ortiz* sense, then the justifications for precluding opt outs are inapplicable, and exclusionary rights are essential.

absent parties who are to be bound by it.") (citation omitted); *Pelt v. Utah*, 539 F.3d 1271, 1285 (10th Cir. 2008) ("There are no mandatory notice requirements in subsections (b)(1) and (b)(2) actions, and members do not have the opportunity to opt out of the class, opportunities accorded to subsection (b)(3) class members.  As a result of these distinctions class members in (b)(1) and (b)(2) actions must necessarily rely on the representative to protect their interests.") (citations omitted). Consequently, when there is an actual limited fund (in the *Ortiz* sense), and there are representatives who adequately represent and protect absentees' interests, the court's judgment binds the class.

In this case, therefore, the dispositive issue is whether Juris's interests, as an absent class member, were adequately represented during the certification and approval process.  Juris contends that class representatives, class counsel, and various objectors did not adequately protect her interests.  (Doc. #288 at 20-22).  Specifically, she identifies six representational defects: (1) "[n]one of the objectors raised the issue of personal jurisdiction over an absent class member in [her] position;" (2) "[n]one of the objectors appealed the issue of the applicability of the *Ortiz* case which was pending in the Supreme Court at the time that the Inamed final judgment was approved;" (3) "[n]one of the objectors filed a Rule 60 motion to attack the settlement when Inamed filed public documents demonstrating a more favorable financial condition;" (4) Juris "had injuries that were not yet manifest;" (5) Juris "had no knowledge that her implants were manufactured by the defendant;" and (6) "the settlement did not sufficiently distinguish and protect the rights of those . . . who would experience future injuries, as required by *Amchem* and *Ortiz*."  (Doc. #288 at 21-22).

Before addressing each alleged inadequacy, clarifying the appropriate analytical framework is necessary.  Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  As analyzed above, this is not merely a procedural

requirement – it is constitutionally essential.   When collaterally examining the adequacy of representation, the court must consider "a two-pronged inquiry: (1) Did the trial court in the first suit correctly determine, initially, that the representative would adequately represent the class? and (2) Does it appear, after the termination of the suit, that the class representative adequately protected the interest of the class?"  *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973).   The first prong addresses the standard generally applicable at the certification decision: "(1) the representative must have common interests with the unnamed members of the class; and (2) it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel." *Id.*; *see also* 1 NEWBERG ON CLASS ACTIONS § 3:22 (4th ed. 2009) ("[T]he basic guidelines for the Rule 23(a)(4) prerequisites are (1) absence of conflict and (2) assurance of vigorous prosecution.").  And with respect to this first prong, the inquiry is limited only to the facts before the district court at certification.   This is in contrast with the second prong, which assesses representative adequacy during the class action's lifetime.  But the post-judgment collateral examination of a representative's adequacy primarily hinges on "whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class.  A court must view the representative's conduct of the entire litigation with this criterion as its guidepost."  *Gonzales*, 474 F.2d at 75.   This "determination turns on whether the interests of the class were 'compatible' with those of the party attempting to attack the class action judgment collaterally."  *Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 173 (2d Cir. 2006) (citations omitted).  "Once the case proceeds to final judgment and is asserted as part of a claim preclusion defense, the question shifts from incentive to litigate to whether the absent parties' interests were *in fact* vigorously pursued and protected."  *Pelt*, 539 F.3d at 1287 (citing *Hansberry*, 311 U.S. at 42-43; *Gonzales*, 474 F.2d at 75; 18A FEDERAL PRACTICE

& PROCEDURE – CIVIL § 4455 (3d ed. 2007)).  Under this framework, therefore, the lynchpin issue is not whether Judge Pointer correctly (or incorrectly) decided particular challenges to the Inamed Class Settlement; rather, a determination of adequate representation turns on whether the absentee's interests, assuming materiality, were actually presented and considered at certification.  From this vantage, the court addresses Juris's challenges in turn.

First, regarding personal jurisdiction, the law firm of Sheller Ludwig & Badey, on behalf of unspecified clients, and attorney Ann Bond, on behalf of class member Jennifer Chism, separately "contend[ed] that due process requires class members to be given an opportunity to opt out of class actions involving money damage claims, apparently relying on *Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985) (in 'class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments,' a state court may constitutionally bind absent class members only if it affords them an opportunity to opt out)."  (Doc. #290-5, Resp. of Inamed at 5-6).[40] In 1998, Inamed offered the following response to the objectors' argument:

> In *Adams v. Robertson*, 117 S. Ct. 1028 (1997), however, the Supreme Court made clear that *Shutts* addressed only the narrow question of whether a "state court lacked personal jurisdiction over out-of-state class members, not the different and broader question of whether . . . due process requires that all class members have the right to opt out."  117 S. Ct. at 1030.  *Shutts* did not purport to decide the jurisdictional reach of federal courts over absent plaintiff class members, and it pointedly declined to express a view on the extent of judicial power to bind absent class members, without a right of opt-out, in a suit seeking equitable distribution of a limited fund.

---

[40]Although the objection does not use the terminology "personal jurisdiction," *Shutts* establishes the conditions precedent for a court to follow in order to exercise personal jurisdiction over Rule 23(b)(3) absentee class members – they are not procedural requirements generally applicable to class actions regardless of the circumstances.  *Shutts*, 472 U.S. at 811-12.  To the extent that *Shutts* bundles due process and personal jurisdiction, the objectors, because they contended that *Shutts* applies to a Rule 23(b)(1)(B) class action, effectively raised the personal jurisdiction issue.  Indeed, as discussed more fully above, Inamed, in response to the objections, analyzed not only the purported right to opt out, but additionally the power of the court to bind absentee class members under Rule 23(b)(1)(B).

     In fact, the judicial power to bind absent plaintiffs in a mandatory class action seeking to vindicate rights in a common fund has been recognized at least since *Smith v. Swornstedt*, 57 U.S. (16 How.) 288, 302-03 (1853) (in cases involving a "common interest in a common right," "[a] court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court").  In the ensuing 140 years, the Supreme Court has repeatedly upheld the binding effect of these traditional class actions, so long as class members received adequate representation.  In *Hansberry v. Lee*, 311 U.S. 32, 40 (1940), the court acknowledge that a "class" or "representative suit["] was a "recognized exception" to the general rule that an *in personam* judgment can have no binding effect on persons not parties to the proceeding.  *See also Richards v. Jefferson County*, 517 U.S. 793, 798-99 (1996); *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (both reaffirming *Hansberry*).

     None of these traditional equitable class action cases recognized or even suggested a due process right to opt out, and the same necessarily is true [as to] their direct lineal descendant under modern procedure, the "limited fund" class action under Rule 23(b)(1)(B).  Analogizing to these equitable antecedents, modern courts have reasoned that due process requires no right to opt out, and courts may bind class members otherwise absent from the jurisdiction, where necessary to bring about an equitable distribution of a limited fund too small to survive litigation of individual claims.  *E.g.*, *In re Orthopedic Bone Screw Prod. Liab. Litig. (Acromed)*, 176 F.R.D. 158, 180-81 (E.D. Pa. 1997); *In re Jackson Lockdown/MCO Cases*, 107 F.R.D. 703, 710 (E.D. Mich. 1985).

(Doc. #290-5, Resp. of Inamed at 6-7) (footnotes omitted).  In support of the settlement and against the right to opt out, Class Counsel stated that "in this case, even the allowance of a single opt out would cause the financing upon which the proposed settlement, and Inamed's continued solvency depend, to collapse.  Even if this court were not constrained to do equity to the class in these limited fund circumstances, the allowance of even a single opt-out would not constitute 'basic fairness' either to the majority of the class members, or to those few who have indicated the desire to opt out.  Upon opt out, their claims would not get far before being halted by Inamed's insolvency or bankruptcy.

The ensuing race to the courthouse door would be called on account of bankruptcy before the opt-out racers had left the starting blocks." (Doc. #290-6, Resp. of Settlement Class Counsel at 9-10). Judge Pointer, after considering these objections, overruled them and, by implication, endorsed Defendants' analysis as to *Shutts*, due process, and personal jurisdiction over absent class members in Rule 23(b)(1)(B) class actions. (Doc. #59, Order 47A ¶ 5(d)). Accordingly, to the extent that Juris argues that her interests were inadequately represented because objectors did not raise a personal jurisdiction challenge, her contention is simply inaccurate.

Second, Juris claims that the class representatives and objectors were inadequate because they did not appeal Orders 47A and 47B after the Supreme Court's decision in *Ortiz*. (Doc. #288 at 21). On the one hand, even if filed on the same day *Ortiz* was decided, an appeal of Order 47A would have been untimely. Judge Pointer entered Order 47A, which certified the class pursuant to Rule 23(b)(1)(B), on February 1, 1999. (Doc. #59, Order 47A). On June 23, 1999, nearly five months later, the Supreme Court decided *Ortiz*. Order 47A, which contained Judge Pointer's factual findings and conclusions of law as to certification, was effectively unappealable once the Supreme Court decided *Ortiz*. On the other hand, Juris's argument begs the question by assuming that Judge Pointer wrongly decided Order 47A, and the Eleventh Circuit or the Supreme Court would have reversed his decision by considering *Ortiz*'s guideposts. As discussed above, however, Order 47A satisfies the requirements for Rule 23(b)(1)(B) class treatment as outlined by the Supreme Court, and given the absence of a substantial question to the contrary, the court cannot conclude that Juris was inadequately represented (based upon the lack of an appeal).

Additionally, Juris has not identified any cases to suggest that the class representatives' or the objectors' failure to appeal a settlement, in the abstract, renders them constitutionally inadequate.

86

Nevertheless, the former Fifth Circuit's decision in *Gonzales v. Cassidy* is instructive. There, the court held that a named representative's decision not to appeal a class judgment is inadequate representation when the failure would advance the named representative's interests while prejudicing the absentees' interests. *Gonzales*, 474 F.2d at 75 ("The narrow question, therefore, is whether Gaytan's failure to appeal this order, which denied retroactive relief to all members of the class except Gaytan, constitutes inadequate representation of the class so that they are not bound by the judgment. We are compelled to hold that Gaytan's failure to prosecute an appeal on behalf of the other members of his class rendered his representation of them inadequate."); *see also Brown*, 982 F.2d at 390 ("In *Gonzales*, the class members collaterally attacked the settlement, demonstrating that the class representative secured a better monetary deal for himself than the rest of the class, and it was because of this that he failed to pursue an appeal on behalf of the class.").

*Gonzales* does not purport to identify the only scenario whereby a class representative's decision not to appeal renders representation inadequate. But it does reveal that a representative's litigation choice implicates adequacy when the decision advances the representative's interests by subordinating absent class members' interests. That holding accords with general principles regarding adequacy of representation. *See, e.g.*, *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982) (defining "adequate representation" as "an absence of antagonism" or "a sharing of interests between representatives and absentees"). Here, unlike *Gonzales*, the named representatives received the same payout under the Inamed Class Settlement as the absentee class members, such as Juris. Accordingly, Juris was adequately represented, despite the representatives' decision not to appeal, because the class representatives benefitted no more – and no less – than Juris by not appealing Order 47A.

The court fully acknowledges that, conceivably, tactical decisions, such as a decision not to appeal, may be relevant to the adequacy analysis.  For example, some strategy decisions may be so patently unwise that they cast doubt on the representative's zeal.  Absent the extreme, however, a deferential standard must be applied in order to avoid post-judgment dissection of each decision culminating in the class judgment because "[a]n overly liberal application of unrestricted *de novo* collateral review endangers the finality of judgments and discourages the desire to effect a compromise."  4 NEWBERG ON CLASS ACTIONS § 11:64 (4th ed. 2009).  At least one commentator has suggested that "[a] better approach would adopt a strong presumption of fairness of the judgment after settlement, requiring the moving party to rebut the presumption by demonstrating that a defect in the proceedings went uncorrected by court or counsel, and that the defect affected the litigation in a manner prejudicial to the class or the individual member."  *Id.*  Otherwise, the finality attendant to a judgment is replaced with unconstrained collateral proceedings that scrutinize, without the benefit of firsthand supervision, the representative's choices.

Here, Judge Pointer's decision to certify the class pursuant to Rule 23(b)(1)(B), even without the benefit of *Ortiz*, did not present the sort of substantial error likely to motivate a class representative or objector to appeal (especially considering, as discussed above, that in any event Order 47A passes *Ortiz* muster).  Indeed, Judge Pointer actually considered the impact of *Ortiz* on the Inamed Class Settlement when he observed that, "[u]nlike the situation in [*Ortiz*], there cannot be any serious dispute about this being a 'limited' fund case – indeed an extremely 'limited' fund case to the extent of providing what most claimants would view as only '*de minimis*' distributions." (Doc. #70, Order 47B at 2 n.6).  Would there have been value in having the parties brief this issue?

Perhaps, but perhaps not.  Judge Pointer reviewed *Ortiz* and concluded independently that the decision did not bar class treatment in this case.  He was right.

Moreover, prudent tactical reasons existed for not appealing Order 47A.  As described throughout, Inamed's senior creditors conditioned their financing on the existence of a mandatory class.  If class members had appealed the certification decision, a substantial risk existed that, instead of facing further litigation, the senior creditors would withdraw the funding, force Inamed into bankruptcy, and recoup their investment without further consideration of the breast implant litigation.  Similarly, if the class representatives or objectors had successfully appealed (as Juris contends that they could have and should have), then the senior creditors certainly would have withdrawn the financing and forced Inamed into bankruptcy.  (Doc. #290-6, Resp. of Settlement Class Counsel at 4, 9).  That is, a successful appeal necessarily would have rendered mandatory treatment, as Juris argues, inapplicable, yet the undisputed evidence, at the time, established that the senior creditors were wholly unwilling to finance settlement on any other terms.[41]  Thus, compelling reasons existed for not appealing Order 47A, and they were arguably aimed at ensuring the limited fund's existence for the class's benefit.

Third, according to Juris, the class representatives and objectors were inadequate because they did not revive the litigation when Inamed reported, in early 2000, its 24% increase in sales for fiscal year 1999.  Juris contends that class members inadequately reflected her interests because, once it became clear that Inamed was rebounding post-settlement, someone should have filed a

---

[41]Hornsby, Class Counsel for future claimants, expressed this exact concern: "I didn't file a notice of appeal obviously because I just didn't see where – it would have made the only arrangement that could have gotten claimants anything collapse because it would have delayed it, the investors would have pulled out and gone on, and I just didn't see  the benefit of, you know, any appeal."  (Doc. #287, 12/14/09 Hearing Transcript 93:2-8).

motion to set aside the judgment on the grounds that Inamed's finances had not been inadequate.  For the reasons outlined above, the court concludes that plausible, non-fraudulent reasons existed for Inamed's post-settlement turnaround.  *See* discussion *supra* Part III.B.  A class representative's failure to pursue an otherwise insubstantial question of fact or law does not amount to inadequate representation.

Fourth, because her injuries had not manifested at the time of settlement, Juris claims that the class representatives were inadequate.  This contention is flawed on two levels.  The class representatives in this case reflected the varying stages of illness associated with breast implants.  (Doc. #59, Order 47A ¶ 3(d)).  At least one of the named representatives had Inamed-brand breast implants but had not yet manifested any injury as of the time of certification.  (Doc. #59, Order 47A ¶ 3(d)).  Moreover, there was additional protection for class members with potential future injury.  A member of Class Counsel, Ernest Hornsby, a very highly regarded attorney, represented claimants without present harm.  (Doc. #269-5, Decl. of Class Counsel ¶ 6).  In addition to these formal assurances of representation, future claimants filed objections to the settlement.  Objectors, who had experienced severe injury, filed challenges to the proposed settlement, and some appeared at the Fairness Hearing.  The implication is clear: whether considering Juris's condition at certification or at present, class members, who reflected her unique concerns, objected to the settlement on precisely the same grounds as Juris now raises.  Merely because Juris had not been physically present or present through a filed objection does not translate to a settlement reached without adequate representation of her.  Her challenges to the settlement asserted now were presented by other, similarly situated class members similarly situated and were considered and rejected by Judge Pointer.

Fifth, and similar to the above objection, Juris claims inadequacy because, at the time of settlement, she did not know that Inamed had manufactured her implants.  Although it does not appear that a named representative was at the time unaware of her breast implant manufacturer,[42] four objectors – Lois Clay, Dolores Doll, Alice Lonergan, and Sherry Van Pelt – raised precisely this concern: "Four of the 62 respondents have objected on the basis that they have thus far been unable to identify the manufacturer of their implants and hence may be unable to provide the necessary information for eligibility within the stated deadline." (Doc. #70, Order 47B at 3).  Juris's concern was raised by objectors to Judge Pointer and he concluded that, "given potential barriers to claims arising from statutes of limitations and the implicit prospect of deferring division until they have (at some undetermined point in the future) been able (if ever) to obtain such information, their objection does not call for any change in the plan."  (Doc. #70, Order 47B at 3).

Finally, Juris contends that Order 47A, which did not formally sub-class among present and future injury claimants, violated the Supreme Court's instructions in *Amchem* and *Ortiz* regarding subclasses.  In *Amchem Products v. Windsor*, the Supreme Court, affirming the Third Circuit's decision to decertify a class action under Rule 23(b)(3) purporting to achieve global settlement of current and future asbestos-related claims, concluded that "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned.  More saliently, for the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."

---

[42]Of course, the fact of the matter is that such a person would not have been a named representative against Inamed.

521 U.S. 591, 626 (1997) (citing *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 331 (1980)).

The Court, refining this analysis in *Ortiz*, concluded that "a class divided between holders of present

and future claims (some of the latter involving no physical injury and to claimants not yet born)

requires division into homogenous subclasses under Rule 23(c)(4)(B), with separate representation

*to eliminate conflicting interests* of counsel."  527 U.S. at 856 (citing *Amchem*, 521 U.S. at 627)

(emphasis added).  In other words, the rule in *Amchem*, and as clarified in *Ortiz*, is not a general class

management rule to be blindly applied without reference to the class's dynamics, identity, and nature

of relief; rather, the mandate to sub-class is relevant only as a safety-valve against class counsel

subordinating the interests of some class members to benefit others, including non-class members

as in *Ortiz*.  *See id.* at 864-65 ("Those separate settlements, together with other exclusions from the

claimant class, precluded adequate structural protection by subclass treatment, which was not even

afforded to the conflicting elements within the class as certified.").

Placed in context, therefore, Juris's argument – that a failure to formally sub-class renders

the representation inadequate – is simply wide of the mark.  As a practical matter, sub-classing

ensures that divergent interests are not pitted against one another to the benefit of one at the expense

of the other.  In this case, however, Judge Pointer protected against antagonistic alignment within

the class.  Judge Pointer designated Sandy Altrichter, Janell Crumley Black, Darlene Davis, Lois

Hamilton, Rose Marie Hodges, and Gloria Jones as class representatives.  (Doc. #10, Order 47 ¶

2(c)).  These women reflected the representative interests of the class members.  Among them, there

were "class representatives with no manifested injury, . . . class representatives with . . . minor to

moderate injuries, and . . . one class representative . . . who [was] disabled, totally disabled, very

seriously injured."  (Doc. #269-6, 1/11/99 Hearing Transcript 59:4-12).  Lois Hamilton, "who

received Cox-Uphoff implants in 1986, [had] been diagnosed with systemic lupus and, under the terms of the original global settlement, submitted a claim for total disability." (Doc. #290-6, Resp. of Settlement Class Counsel at 11). Relatedly, Judge Pointer appointed Ralph Knowles, Leslie Bryan, Dianna Pendleton, Elizabeth Cabraser, and Ernest Hornsby as Class Counsel. (Doc. #10, Order 47 ¶ 2(c)). Hornsby, "a plaintiff's attorney with extensive Breast Implant trial experience[,] . . . represent[ed] [named implant recipients with potential future claims . . . ." (Doc. #269-5, Decl. of Class Counsel ¶ 6). Accordingly, the class's court-appointed representatives and counsel served as the functional equivalents of formally sub-classed groups, which ensured that the class representatives, as well as their counsel, participated directly in negotiations and litigation. The assurance of fairness, meaningful participation, and adequate representation is the driving force behind *Amchem* and *Ortiz*'s sub-classing analysis. *See Ortiz*, 527 U.S. at 855-56 ("[A]t the least such a settlement [covering current and future claimants] must seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves.").

Moreover, Judge Pointer explicitly rejected the need to sub-class given the unique dynamics associated with this litigation. According to Judge Pointer at the Fairness Hearing, because Defendants suffered from severe financial stresses, the only issue was whether "it's better to have 31.5 million rather than to have zero" – at least as to the first stage of class certification – which rendered the sub-classing issue unnecessary, as divergent interests overwhelmingly coincided on this single point. (Doc. #269-6, 1/11/99 Hearing Transcript 46:22-48:12). Although he contemplated that formal sub-classing may be appropriate at consideration of proposed distribution schemes, Judge Pointer, at that later point, observed that "[c]lass counsel – some of whom represent clients with

93

existing medical problems and others of whom represent clients without presently documented problems – have, with the court, struggled with this problem and have reluctantly come to the conclusion that a pro rata division remains the better – and indeed only workable – solution under the facts of this case." (Doc. #70, Order 47B at 5). Judge Pointer reached this conclusion despite numerous filed objections that "simply and directly . . . asserted that more of the settlement fund should be distributed to those . . . who allegedly have had (or perhaps in the future may have) medical problems, expenses, suffering, etc." (Doc. #70, Order 47B at 5). In other words, Judge Pointer received objections from then-currently injured claimants who requested that a higher percentage of the fund should be devoted to them, and he likewise received objections from future injury claimants who requested the exact opposite. These objections, which mirror the concerns that subdivided "currents" and "futures" groups likely would have produced respectively, reached the court notwithstanding the absence of formal sub-classes.[43]

And according to Judge Pointer, differential payouts would have been preferable "[i]f the amount of the funds available for distribution were substantially greater and/or the potential distributees not so numerous . . . ." (Doc. #70, Order 47B at 5). Nothing indicates that Judge Pointer would have treated these concerns differently if he had received them from formally designated sub-class representatives rather than somewhat differently situated at-large class objectors. Thus, although not addressing by name *Amchem* and *Ortiz*, Judge Pointer's considerations mirror the considerations as noted above. In *Amchem* and *Ortiz*, the Supreme Court did not fault the district courts for their failure to sub-class *per se*; rather, the certification errors arose because significant

---

[43]If there were differentiations, those who could at the time show significant injury would have benefitted more than those who had not yet experienced any effects.

conflicts permeated the class settlements and distributions, and the lack of sub-classing exacerbated those concerns.  Here, on the other hand, objectors insisted on differential treatment based on status of injury (*i.e.*, current or future), but Judge Pointer rejected subdivision because, according to his finding, the class settlement was not fatally infected with conflicts like those present in *Amchem* or *Ortiz*.  Instead, the class's interests were unified insofar as distribution of a $31.5 million fund was superior to not receiving anything, and given the financial reality, this singular interest was compelling.[44]  Once he considered the distribution, he realized that, given the size of the class compared to the fund, graduated treatment among the variously injured claimants would have been, at least, inequitable and, at most, inconsequential.  Accordingly, at the Fairness Hearing and in Order 47B, Judge Pointer resolved the issues underlying the Supreme Court's instruction to sub-class, and because of his conclusions, sub-classing would have been superfluous.[45]  In short, class representatives, as well as the various objectors, raised the precise concerns that Juris inaccurately argues were overlooked.  Her interests were represented.

Juris's only arguments against the validity of the Inamed Class Settlement were raised, briefed, and overruled in 1999.  Although due process certainly requires adequacy of representation, it requires neither an opportunity to assert specific challenges personally nor the court to correctly

---

[44]A higher percentage of zero is not as valuable as a pro-rata share of $31.5 million.

[45]Similarly, in *In re Diet Drugs Products Liability Litigation*, absent class members collaterally attacked the settlement by relying on *Amchem* and arguing that the district court erred by not subdividing the class into current injury and future injury claimants.  431 F.3d 141, 147 (3d Cir. 2005).  In that case, the district court "specifically found that there is no 'futures' problem with [the] Settlement Agreement because, unlike *Amchem*, where asbestos class members could not know of their exposure or disease, potential class members are aware of their exposure to diet drugs and any injuries from that exposure are detectable in medical tests – the injuries will not remain latent for 30 to 40 years."  *Id.*  The Third Circuit concluded that, because the absent class members' concerns had been raised and decided by the district court, they had been adequately represented.  *Id.* at 148.

decide the objection.[46]  When interests among claimants are sufficiently aligned, as they were here,

the representatives, and even objectors, stand as proxies for the absentees.  As the Eastern District

of Pennsylvania persuasively explained in the context of collateral attacks, "the fact that specific

individuals are not the same class members who earlier raised objections does not mean second-in-

time class members must be accorded their own opportunity to litigate an issue personally.  'If this

argument were to be accepted, each class member would be able to relitigate each issue, rendering

the class action mechanism pointless.'" *In re Diet Drugs Prods. Liab. Litig.*, 434 F. Supp. 2d 323,

335 (E.D. Pa. 2006) (quoting *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141, 147 (3d Cir. 2005)).

Here, the class representatives, who reflected the diverse constituency of the Inamed Class, and

various objectors raised the exact concerns that Juris now asserts.  Judge Pointer overruled these

challenges in 1999; accordingly, Juris's interests were adequately represented during the class

certification and settlement approval process.

        Under *Gonzales*, a post-judgment assessment of adequacy of representation is limited to a

single inquiry: "whether the representative, through qualified counsel, vigorously and tenaciously

protected the interests of the class."  474 F.2d at 75.  As Juris's counsel conceded, however, there is

absolutely nothing in the record to suggest that Hornsby, acting as Class Counsel on behalf of future

claimants, suffered from a conflict of interest.  (Doc. #287, 12/14/09 Hearing Transcript 27:10-14).

Similarly, nothing in the record suggests that the Class Representatives, who served as stand-ins for

future claimants and those seriously injured, shirked their representational roles.  Indeed, as

explained above, all of the concerns that she cites now were actually raised over ten years ago and

_____

[46]To be clear, the court alternatively concludes Judge Pointer correctly ruled on each of the objections presented
to him.

96

considered by Judge Pointer prior to entering Orders 47A and 47B.  Thus, to the extent that she claims inadequacy of representation as a result of omissions, her contention is mistaken.

Accordingly, on February 2, 1999 and after having independently reviewed the financial disclosures and various submissions, Judge Pointer was satisfied that Class Counsel, on behalf of the Inamed Settlement Class, brokered the best deal possible under all the circumstances.  Contrary to Juris's suggestion, the unforeseeable developments post-judgment, which undoubtedly arose as a direct result of global resolution, do not render Class Counsel and Class Representatives constitutionally inadequate.

Although other courts have concluded that adequacy of representation is a sufficient test for assessing due process in the Rule 23(b)(1)(B) context, the Eleventh Circuit additionally requires notice prior to certification.  In *In re Temple*, 851 F.2d 1269, 1270-71 (11th Cir. 1988),[47] the district court certified a Rule 23(b)(1)(B) mandatory class consisting of current and future claimants who asserted injuries related to asbestos exposure.  *Id.* at 1270-71.  The Eleventh Circuit reversed the certification order because, *inter alia*, the district court "did not notify *any* of the putative class members."  *Id.* at 1271-72 (emphasis added).  In particular, the court held that "[u]nlike class members in cases certified under Rule 23(b)(3) who may opt out of the action and have no need for prior notice of efforts to obtain class certification, members of a mandatory class need to be provided with notice to contest the facts underlying a certification they may strenuously oppose."  *Id.* at 1272.

---

[47]At the time the Eleventh Circuit decided this case, Rule 23(c)(2) required pre-certification notices only when Rule 23(b)(3) class actions were being considered for certification.  FED. R. CIV. P. 23(c)(2) (1987).  In 2003, the Advisory Committee revised Rule 23, and currently, according to Rule 23(c)(2)(A), the district court "may direct appropriate notice to the class" if a Rule 23(b)(1)(B) class action is being considered for certification purposes.

The Eleventh Circuit, therefore, constitutionalized pre-certification class notice. *Id.* ("The court's failure to notify petitioners of the certification hearing violated due process.").

In this case, it is uncontested that Juris did not receive actual notice of the certification hearing. Although *Temple* identified a due process violation when the district court fails to direct any notice, the decision is silent regarding whether actual notice to each and every absent class member is constitutionally required. For reasons stated in more detail below, the court finds that actual notice is not required. And to be sure, the court is certainly comfortable with that outcome in this case. That is because the attendant circumstances giving rise to the *Temple* decision blunt the concern here. In *Temple*, the Eleventh Circuit was more concerned with the "non-adversarial nature of the proceedings below" that "led to the premature and speculative finding that a limited fund existed." *Temple*, 851 F.2d at 1272. The non-adversarial proceedings stemmed from a failure to notify interested parties, including class members, who pursued appellate review post-certification. *Id.* Provided that notice of pending certification reaches a critical mass of putative class members such that the certification proceedings are approached with the essential adversarial nature, the process guaranteed to absent class members is ensured. In other words, *Temple*, properly read, links the level of notice to the adequacy of represented interests.

The Northern District of Alabama's decision in *Battle v. Liberty National Life Insurance Co.*, 770 F. Supp. 1499 (N.D. Ala. 1991), *aff'd*, 974 F.2d 1279 (11th Cir. 1992),[48] makes this connection apparent. The *Battle* litigation concerned a final settlement of a mandatory, non-opt out class action certified pursuant to Rule 23(b)(2). *See Battle*, 877 F.2d at 879-80. After the settlement, dissatisfied

---

[48]According to the Eleventh Circuit, "We are not presented with any reversible error on the part of the district judge." *Battle*, 974 F.2d at 1280.

class members initiated a collateral attack in the Northern District of Alabama once their state court proceedings were enjoined. *Id.* In their collateral attack, they alleged that the class settlement was infirm because they had not received personal notice. *Battle*, 770 F. Supp. at 1508. The court rejected this contention and held, in the context of Rule 23(b)(2) class settlements,[49] that the class's degree of cohesiveness governs whether, and to what extent, individualized notice is required:

> Because such notice was appropriately designed not to afford absent members the chance to exclude themselves from the class, but rather to inform them of the pendency of the action and permit them to challenge the representation by the named plaintiffs and class counsel or to otherwise intervene, the fact that paid-up policyholders did not receive notice did not frustrate this purpose. Because such policyholders shared the same interests as those who did receive notice, the latter could adequately speak for them vis-a-vis the named plaintiffs and class counsel.

*Id.* at 1520 (citations omitted). Thus, when the class is composed of plaintiffs with singular interests, or at least when class representatives and objectors to the class settlement reflect the interests of parties who did not receive notice, then the notice's failure to reach all class members does not violate due process. Stated plainly, due process does not require that an absent class member should have an opportunity to assert an objection that is otherwise raised during the certification process. But as discussed above in the context of adequate representation, Juris's interests were represented and reflected during certification. Accordingly, merely because she personally was not notified of the pending certification and resulting settlement, and did not have the opportunity to personally

---

[49]Although *Battle* proceeded as a Rule 23(b)(2) class action unlike the class action here, the difference is without a distinction for purposes of notice. According to *Temple*, a district court is required, in a mandatory class action, to direct notice pre-certification to absentee class members. *Temple*, 851 F.2d at 1272 ("Unlike class members in cases certified under Rule 23(b)(3) who may opt out of the action and have no need for prior notice of efforts to obtain class certification, members of *a mandatory class* need to be provided with notice to contest the facts underlying a certification they may strenuously oppose.") (emphasis added). Accordingly, the Northern District of Alabama's decision regarding whether actual notice is required for (b)(2) class actions is highly persuasive here, as both Rule 23(b)(1)(A) and Rule 23(b)(2) class actions are mandatory.

99

assert objections that were raised and pressed by others, does not translate to a failure of due process. In fact, as reflected in the chronology of this case and the objections raised to the settlement, the certification and settlement process were approached in a sufficiently adversarial manner. To the extent that *Temple* demands notice to ensure adequate scrutiny of a settlement proposal, notice in this case satisfied that requirement.

Juris additionally contends that "meaningful notice for 'future' claimants' . . . was, in fact, impossible." (Doc. #293 at 28). Her argument relies on the Supreme Court's *Amchem* decision, in which the Court held, in the context of asbestos-related injuries, that "[m]any persons in the exposure-only category . . . may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem*, 521 U.S. at 628. Nevertheless, in 1998, objectors raised this very concern asserted by Juris, and Inamed offered the following response:

> The Sheller objection includes an assertion that notice to claimants not present ill "cannot meet the requirements of Rule 23 and due process." This argument undoubtedly derives from *Amchem Prods. v. Windsor*, 117 S. Ct. 2231 (1997), in which the Supreme Court questioned, without deciding, whether adequate notice could ever be given to "exposure-only" asbestos victims in the context of an opt-out class certified under Rule 23(b)(3). The situation here, however, is not at all analogous. Unlike "exposure-only" asbestos victims who may not know of their exposure to that product until they contract asbestos-related diseases, all breast implant recipients, whether or not currently ill, know that they have had implants and thus are capable of being notified by notices addressed to them. In addition, the Supreme Court's concern in *Amchem* that "those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to opt out," 117 S. Ct. at 2252, is not applicable to non-opt-out classes.

(Doc. #290-5, Resp. of Inamed at 8).  Juris does not contend (and has never contended) that Judge Pointer incorrectly rejected this challenge in 1999, and this court concludes that *Amchem* is sufficiently distinguishable from the present case based on Inamed's initial response.

Finally, the notice issued, under the circumstances, was the best practicable.  Although Juris did not receive actual notice of the Inamed Class Settlement, contrary to her suggestion, due process does not demand actual notice.  "Due process requires that class notice must be 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Adams v. S. Farm Bureau Life Ins. Co.*, 417 F. Supp. 2d 1373, 1380 (M.D. Ga. 2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  "The analysis for purposes of due process is on the notice plan itself, and actual receipt of notice by each individual class member is not required." *Id.* at 1380 n.6 (citing *Dusenbery v. United States*, 534 U.S. 161, 171 (2002)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D.N.J. 1997) ("Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested parties.") (collecting cases); 4 NEWBERG ON CLASS ACTIONS § 11:53 (4th ed. 2009) ("[In the settlement context], due process does not require actual notice, but rather a good faith effort to provide actual notice.  Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprize interested parties.  Similarly, Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members.").  The critical inquiry is whether, under the circumstances, the method adopted and ordered by Judge Pointer to apprise class members of the settlement and certification was reasonable.

First, Juris does not argue that the content of the notice was defective.  Indeed, the court has reviewed the notice, and it certainly complies with established Eleventh Circuit caselaw.  *See, e.g.*, *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998) ("Surely the best notice practicable under the circumstances cannot stop with . . . generalities.  It must also contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member . . . .") (citation omitted).  Second, and more importantly, Judge Pointer's approved method of distributing notice satisfied due process requirements.  The court has summarized the notice efforts in this case.  *See* factual and procedural history *supra* Part I.B.  But to be clear, Judge Pointer directed individual notices to be mailed to 250,000 women who had registered with the Claims Office and 28,000 attorneys who represented breast implant litigants.  (Doc. #269-6, 1/11/99 Hearing Transcript 4:8-15).  Additionally, notice of the proposed settlement and certification/fairness hearing was published in *People Magazine*, *USA Today*, and *Modern Healthcare Magazine* as well as on *Modern Healthcare Magazine*'s website and the court-supervised website.  (Doc. #269-13, Klausner Aff. ¶¶ 3-4; Doc. #269-6, 1/11/99 Hearing Transcript 5:7-10).  As the Southern District of New York explained, "[t]his combination of mailed notice to all class members who can be identified by reasonable effort and published notice to all others is the long-accepted norm in large class actions . . . ."  *Gordon v. Hunt*, 117 F.R.D. 58, 63 (S.D.N.Y. 1996) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 71 (2d Cir. 1982)).

In response, Juris suggests that notice could have been more targeted through use of medical warranty cards:

> When breast implants are sold, they are a medical device, and they are supposed to be sold with a registration card.  The doctor fills them out.  The implants are actually sold to the physician.  When the

> implant is implanted, there's a card filled out at the time, and it should
> be kept with the doctor and a copy returned to the manufacturer.

(Doc. #287, 12/14/09 Hearing Transcript 49:10-15). First, Juris has not produced any evidence substantiating her representation that Inamed had such records on file at the time of certification. Second, the simple availability of alternative notice options does not render the notice plan employed here procedurally deficient, and Juris has not identified any caselaw to support such a proposition. Third, her contention is subsumed by the court's broader conclusions that: (1) Rule 23(b)(1)(B) class actions require notice sufficient to create adversarial review of settlement and, by implication; (2) actual notice to all class members is not required. Because proper notice occurred and sufficiently adversarial review of the Inamed Settlement was undertaken, Juris's lack of individual notice and, correspondingly, the unsubstantiated claim that more effective notice was available are ultimately immaterial.

To summarize, *Shutts* does not apply to properly certified Rule 23(b)(1)(B) class actions; rather, only two procedural safeguards are owed to absentees: (1) adequate representation and, closely related, (2) notice sufficient to provoke representative and adversarial scrutiny of the proposed settlement. Assuming the rigors of Rule 23(b)(1)(B) are satisfied and due process is observed, the court has authority to enter a final judgment that binds absentees who are otherwise beyond the court's jurisdiction. Here, because (1) Judge Pointer properly certified the Inamed Class Settlement, (2) Juris was adequately represented by class representatives who were future claimants and by attorneys who represented future claimants, and (3) sufficient notice was issued, this court had and has personal jurisdiction over Juris insofar as Orders 47A and 47B are concerned.

**D.**   **Order 47A's Anti-Suit Injunction**[50]

The All Writs Act authorizes a federal court to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  As the former Fifth Circuit explained, the "Act is necessary because federal courts, being courts of limited jurisdiction, would not otherwise possess the tools necessary to implement their jurisdictional grants."  *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978).  In other words, the "All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute.  Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling."  *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

On its own terms, the All Writs Act is a broad repository of federal power; however, its scope is substantially curtailed by the corresponding Anti-Injunction Act, which prohibits a federal court from enjoining state court proceedings absent an exception to the contrary: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  As the Eleventh Circuit has said, "the All Writs Act and the Anti-Injunction Act [are] two statutes that work in conjunction to enable a federal court to exercise its

---

[50]At best, Juris's argument that Order 47A's anti-suit injunction is inapplicable as to her fits Rule 60(b)'s subdivision four, which authorizes relief when "the judgment is void."  FED. R. CIV. P. 60(b)(4).  An injunction is a "judgment" for purposes of Rule 60(b)(4).  *See* FED. R. CIV. P. 54(a) ("'Judgement' as used in these rules includes a decree and any order from which an appeal lies.").  Juris is correct that the enforcement of an injunction, which proceeds from a judgment rendered without due process, may be collaterally attacked on due process grounds.  *See Stephenson*, 273 F.3d at 257 ("The injunction was part and parcel of the judgment that plaintiffs contend failed to afford them adequate representation.  If plaintiffs' inadequate representation allegations prevail, as we so conclude, the judgment, which includes the injunction on which defendants rely, is not binding as to these plaintiffs.").

As the court has already concluded that (1) Juris's due process rights have not been violated and (2) exercising personal jurisdiction over her is proper, the only remaining issue is whether the anti-suit injunction satisfies the exceptions contained within the Anti-Suit Injunction Act.  The court addresses that issue within this section.

104

jurisdiction and enforce its judgment and, at the same time, limit the court's ability to interfere with state court proceedings." *Burr & Forman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006).

Regarding the Anti-Injunction Act, "[t]he precise origins of the legislation are shrouded in obscurity, but the consistent understanding has been that its basic purpose is to prevent needless friction between state and federal courts." *Mitchum v. Foster*, 407 U.S. 225, 232 (1972) (citation and internal quotation marks omitted). In any event, its three embedded exceptions "are narrow and are not to be enlarged by loose statutory construction." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988) (citation, internal quotation marks, and alteration omitted). "Although federal courts are instructed to tread carefully when considering whether to stay state court proceedings, as such a decision directly implicates the very delicate balance struck between the federal and state judicial systems, the decision is ultimately left to the district court's sound discretion." *Bayshore Ford Trucks Sales, Inc.*, 471 F.3d at 1250 (citation and internal quotation marks omitted). Given this discretion, "a district court in a given case may go either way and not be reversed." *G.M. Brod & Co. v. Adler*, 845 F.2d 899, 900 (11th Cir. 1988) (quoting *First Ala. Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 825 F.2d 1475, 1486 (11th Cir. 1987)). Despite the court's discretion, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state court to proceed in an orderly fashion to finally determine the controversy." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970).

In this case, on February 1, 1999, Judge Pointer permanently enjoined all class members, including Juris, "from instituting, asserting or prosecuting against Inamed or the Released Parties, in any pending or future action in any federal *or state court*, any Settled Claim that the member had, has, or may have in the future." (Doc. #59, Order 47A ¶ 7) (emphasis added). Now, Juris contends

105

that the court's anti-suit injunction violates the general prohibition contained in the Anti-Injunction Act.  Specifically, Juris asserts that the anti-suit injunction did not and does not satisfy the Anti-Injunction Act's "in aid of jurisdiction" or "protect or effectuate its judgments" exception.[51]  The court considers each exception in turn.

### 1.      In Aid of Jurisdiction[52]

In *Kline v. Burke Construction Co.*, a case in which a federal district court enjoined a duplicative state court proceeding that involved a breach of contract, the Supreme Court distinguished between injunctions in aid of *in personam* jurisdiction and injunctions in aid of *in rem* jurisdiction:

---

[51]Defendants do not, nor could they credibly, contend that Congress has authorized this sort of injunction. Accordingly, the court does not address the Anti-Injunction Act's congressional approval exception.

[52]Juris repeatedly construes the exchange between the court and her counsel at the December 2009 hearing as foreclosing the applicability of this exception.  According to Juris, "[t]his court acknowledged that the second exception to the Anti-Injunction Act, 'in aid of its jurisdiction,' is not applicable to the present case."  (Doc. #288 at 35 n.9).  At the hearing, however, the court did not rule out the possibility that the "in aid of jurisdiction" exception applies to this case:

| | |
|---|---|
| THE COURT: | Well, the exception that would come into play – and you are right; generally the Act is an absolute prohibition against enjoining state court proceedings unless one of three specifically-defined exceptions applies. |
| MS. LEBOW: | Right. |
| THE COURT: | The one that's in play here is the court's jurisdiction to – or the court's ability to effectuate its judgment. |
| MS. LEBOW: | Correct. |
| THE COURT: | . . . . But the key question here is whether this proceeding in California court would interfere with the effectuation of the judgment here.  Fair? |
| MS. LEBOW: | Absolutely. |

(Doc. #287, 12/14/09 Hearing Transcript 37:1-11).  This exchange does not constitute a "ruling," as Juris suggests. Rather, the court, attempting to understand the scope of Juris's argument and holding one variable constant, simply questioned counsel regarding whether (and to what extent) the "protect or effectuate its judgments" exception applies to this case.  Although not captured in the transcription, the court's second statement was intended to be interrogatory rather than declaratory.

> [W]here a federal court has first acquired jurisdiction of the subject-matter of a cause, it may enjoin the parties from proceeding in a state court of concurrent jurisdiction where the effect of the action would be to defeat or impair the jurisdiction of the federal court. Where the action is in rem the effect is to draw to the federal court the possession or control, actual or potential, of the res, and the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached. The converse of the rule is equally true, that where the jurisdiction of the state court has first attached, the federal court is precluded from exercises its jurisdiction over the same res to defeat or impair the state court's jurisdiction.
>
> . . . .
>
> But a controversy is not a thing, and a controversy over a mere question of personal liability does not involve the possession or control of a thing, and an action brought to enforce such a liability does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending. Each court is free to proceed on its own way and in its own time, without reference to the proceedings in the other court. . . . The rule, therefore, has become generally established that where the action first brought is in personam and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded.

260 U.S. 226, 230-31 (1922). As a general matter, therefore, "concurrent *in personam* actions between the same parties and involving the same subject matter may proceed simultaneously in the courts of the same forum or two or more forums. Concurrent *in personam* jurisdiction does not satisfy the 'necessary in aid of jurisdiction' exception to the Anti-Injunction Act." 17A MOORE'S FEDERAL PRACTICE – CIVIL § 121.07 (2010).

Courts have rigidly enforced this distinction and, correspondingly, rejected litigants' attempts at recasting clearly *in personam* actions hoping to trigger the "in aid of jurisdiction" exception. *See, e.g.*, *Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 132 (5th Cir. 1990); *Universal Bus. Computing Co. v. Comprehensive Accounting Corp.*, 539 F. Supp. 1142, 1144-45 (N.D. Ill. 1982). Nevertheless, the Eleventh Circuit has recognized a narrow exception to this general demarcation. In *Battle v.*

*Liberty National Life Insurance Co.*, the Eleventh Circuit, affirming the district court's anti-suit injunction against parallel state court proceedings post-final judgment, observed that "it makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a *res* to be administered."  877 F.2d 877, 882 (11th Cir. 1989).  In fact, according to the Eleventh Circuit, "[t]his lengthy, complicated litigation is the 'virtual equivalent of a *res*.' *Id.* (quoting *Battle v. Liberty Nat'l Life Ins. Co.*, 660 F. Supp. 1449, 1457 (N.D. Ala. 1987)); *see also In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985) ("In effect, unlike the situation in the *Kline v. Burke Construction Co.* line of cases, the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a *res* over which the district judge required full control.").  The court, therefore, concluded that supervising a complex class action is sufficiently analogous to administering a *res* for purposes of the Anti-Injunction Act's "in aid of jurisdiction" exception to overcome the jurisdictional divide acknowledged in *Kline*.[53]

After *Battle*, the Eleventh Circuit decided *Wesch v. Folsom*, 6 F.3d 1465 (11th Cir. 1993). *Wesch* considered the propriety of a federal district court's anti-suit injunction against a putative state court class action, which was attempting to oust a federally sanctioned congressional redistricting plan.  *Id.* at 1468-69.  The Eleventh Circuit affirmed the district court's injunction under, in part, the framework advanced in *Battle*.  *Id.* at 1470-71.  The court, applying the "virtual equivalent of a *res* to be administered" standard, concluded that the Anti-Injunction Act's "in aid of jurisdiction" exception applied because the district court "in this case invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts."  *Id.*

---

[53]In the alternative, the *Battle* fiction (that a complex class action is sufficiently comparable to a *res*) is arguably unnecessary here.  This court supervised and continues to supervise the equitable division of a limited fund, which is not analogous to a *res* – it is a *res*.

"In these cases, the courts have reasoned that some complex federal cases – particularly those involving multidistrict litigation, substantial pretrial litigation, extended settlement negotiations, or actual settlements – are analogous to *in rem* actions because the lawsuits themselves are 'the virtual equivalent of a *res* to be administered.'" *Lawrence v. Household Bank (SB), N.A.*, 343 F. Supp. 2d 1094, 1100 (M.D. Ala. 2004) (quoting *Wesch*, 6 F.3d at 1470); *see also Burr & Forman*, 470 F.3d at 1032 ("For an injunction properly to issue, the matter in controversy in the federal court proceeding must be 'the virtual equivalent' of a controversy over disputed *res* in an *in rem* proceeding and the state court proceeding must constitute a threat to the federal court's resolution of that controversy."); 17A MOORE'S FEDERAL PRACTICE – CIVIL § 121.07 (2010) ("Federal courts, especially in class actions and mass tort litigation, have suggested that the action itself is a kind of *res*, requiring federal injunctive power over state proceedings in aid of the federal court's jurisdiction."). In short, a complicated class action, over which the court retains continuing and exclusive enforcement jurisdiction, is sufficiently analogous to a *res* such that the Anti-Injunction Act's "in aid of jurisdiction" exception, traditionally applicable only to *in rem* proceedings, validates an anti-suit injunction. This case, which involved resolution of over 40,000 breast implant claims and is paradigmatically complex, presumptively satisfies this standard.

There is, perhaps, a temptation to conclude that this framework is applicable only when the class litigation has not yet concluded. In *Battle*, however, the anti-suit injunction issued after entry of the final judgment. *Battle*, 877 F.2d at 880; *see also id.* at 881 ("Moreover, it is not true, as the state plaintiffs argue, that the 'necessary in aid of' exception is only available prior to the entry of judgment in federal court."). And like the district court in *Battle*, this court has continued to exercise its enforcement jurisdiction to interpret and resolve disputes concerning the Settlement Agreement

and, similarly, supervised the Escrow Agent charged with administering the class settlement.[54]  For example, on March 14, 2003, Inamed filed a motion with this court requesting clarification of certain settlement terms involving the class's access to ongoing medical studies.  (Doc. #122).  Permitting the California State Court litigation to proceed would undercut this court's "flexible approach in resolving the various claims," *Battle*, 877 F.2d at 881, an approach that is required to ensure proper enforcement of the settlement entered as final judgment.[55]  The court finds that the settlement fund approved by Judge Pointer is similar to a *res* to be administered in this case.  Accordingly, the Anti-Injunction Act's "in aid of jurisdiction" exception applies here, and it is appropriate to enjoin Juris from proceeding with her state court suit.

## 2.    Protect or Effectuate Judgments

Additionally, the Anti-Injunction Act authorizes a federal court to issue an injunction that "protect[s] or effectuate[s] its judgments."  28 U.S.C. § 2283.  This exception, generally referred to

---

[54]The Claims Office, as late as December 9, 2009, received claims under the Inamed Class Settlement.  (Doc. #290-14).  As of December 14, 2009, however, the Claims Office acknowledged that only one claim remains unpaid under the Inamed Class Settlement: Juris's claim.  (Doc. #290-14).  Sufficient reserves exist, and assuming that she qualifies, the Claims Office is prepared to honor her claim despite the fact that the deadline for filing claims has technically expired.  (Doc. #290-14).  And as recently as April 28, 2010, the court has continued to exercise its supervisory authority over the Claims Office.  (Doc. #302).

[55]Juris's only attempt at distinguishing *Battle*, a case squarely on point, from this case is unavailing.  Juris argues that in *Battle*, unlike here, all of the class members were Alabama residents, which authorized the exercise of *in personam* jurisdiction over absentees, such as the litigants who proceeded on a collateral attack in state court:

> [*Battle*] involved Alabama funeral home operators and Alabama policyholders who had purchased insurance policies sold in Alabama with respect to services to be provided by an Alabama company.  In the instant case, this court simply does not have personal jurisdiction over the Plaintiff nor is there any basis for federal jurisdiction over her state law product liability claims against a California defendant and its wholly owned California subsidiary.

(Doc. #265 at 10).  This point of distinction is flawed because "it is well-established circuit law that '[the Eleventh Circuit is] not bound by a prior decision's *sub silentio* treatment of a jurisdictional question.'"  *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1231 (11th Cir. 2007) (quoting *Okongwu v. Reno*, 229 F.3d 1327, 1330 (11th Cir. 2000)).  In *Battle*, the Eleventh Circuit never ruled on personal jurisdiction; accordingly, its substantive treatment of anti-suit injunctions is its only holding applicable to this case.  As described, *Battle*'s analysis is clearly applicable here.

as the "relitigation exception," is "appropriate where the state [court] claims would be precluded by the doctrine of *res judicata*." *Burr & Forman*, 470 F.3d at 1030 (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1104 (11th Cir. 2004)).   "In a sense, the relitigation exception empowers a federal court to be the final arbiter of the *res judicata* effects of its own judgments because it allows a litigant to seek an injunction from the federal court rather than arguing the *res judicata* defense in the state court." *Id.* at 1030 n.30.   This exception applies only when a party "make[s] a strong and unequivocal showing of relitigation." *Delta Air Lines v. McCoy Rests.*, 708 F.2d 582, 586 (11th Cir. 1983).

"When determining whether claim preclusion is appropriate, federal courts employ the law of the state in which they sit." *Burr & Forman*, 470 F.3d at 1030 (citing *NAACP v. Hunt*, 891 F.2d 1555, 1560 (11th Cir. 1990)).   Under Alabama law, "the essential elements of *res judicata* are: (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits." *Id.* (quoting *Wesch*, 6 F.3d at 1471).   Based on these elements, Juris narrowly challenges application of the relitigation exception.   Specifically, she argues that "[a]lthough there is identity of parties, in that the Defendants contend that the Plaintiff was an Inamed class member, and similar product liability claims are at issue, there was no decision on the merits in the *Altrichter* case, which was certified as a class for settlement purposes only.   In addition, the court had no personal jurisdiction over the Plaintiff because she did not receive notice of the proceeding, did not have a full and fair opportunity to be heard or to opt out and she was not adequately represented in the previous action." (Doc. #288 at 38-39).   In other words, despite identity of parties and claims, Juris contends that there was not "a prior judgment on the merits" that was "rendered by a court of competent jurisdiction," and

barring her claims as *res judicata* would violate her right to due process.  The court has addressed Juris's due process and jurisdictional[56] concerns elsewhere.  *See* discussion *supra* Part III.C. Accordingly, the only remaining issue is whether Judge Pointer, by approving the Inamed Class Settlement, entered a judgment on the merits.[57]  As the Middle District of Florida has accurately stated, "[n]o specific words are required for an order to constitute a final judgment as long as it is clear that the order is intended to constitute the final action in the case."  *AC Direct, Inc. v. Kemp*, No. 06-122, 2008 U.S. Dist. LEXIS 22156, at \*4 (M.D. Fla. Mar. 18, 2008) (citing *United States v. F&M Schaefer Brewing Co.*, 356 U.S. 227, 232-33 (1958); *Blanchard v. Commonwealth Oil Co.*, 294 F.2d 834, 837 (5th Cir. 1961)).  When Judge Pointer entered Order 47A, styled "Order and Final Judgment," after determining that "every Settled Claim of each member of the Inamed Settlement class is conclusively compromised, settled and released," he ordered that all attendant class claims be dismissed with prejudice.  (Doc. #59, Order 47A ¶¶ 6, 8).  Accordingly, Order 47A actually and functionally served the purpose of entering final judgment as to the class's Settled Claims.  Because a judgment on the merits may arise in the context of settlement and Juris has identified no authority reaching the contrary conclusion, the court concludes that Order 47A constituted a judgment sufficient to satisfy the *res judicata* requirements under the relitigation exception.

---

[56]Juris contends that this court lacks both personal and subject matter jurisdiction to issue and/or enforce an anti-suit injunction.  The court already has analyzed her personal jurisdiction argument.  For the sake of completeness, the court additionally notes that it possesses subject matter jurisdiction to issue and/or enforce an anti-suit injunction under the relitigation exception.  Importantly, "[n]o independent basis of jurisdiction is required for a federal court to entertain an application to enjoin relitigation in state court.  This is thought to be within the ancillary jurisdiction of the federal court, and the jurisdiction that the federal court had when it entered its original judgment is enough to support its issuance of an injunction."  17A FEDERAL PRACTICE & PROCEDURE – CIVIL § 4226 (3d ed. 2010); *see also Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 89-90 (5th Cir. 1977) (concluding that a federal court has ancillary subject matter jurisdiction to issue an anti-suit injunction under the relitigation exception to § 2283).

[57]Of note, Juris offers neither argument nor elaboration as to her assertion that Judge Pointer did not enter a "decision on the merits."  (Doc. #288 at 38).

Therefore, the anti-suit injunction is proper under the relitigation exception. If Juris proceeds in her California State Court action, which raises undisputedly Settled Claims under the Inamed Class Settlement, then she will invariably challenge the judgment rendered by this court as to her causes of action. To be certain, in her California State Court action, Juris asserts strict liability, negligence, breach of express warranty, breach of implied warranty, deceit/negligent misrepresentation, and intentional infliction of emotional distress. (Doc. #217-5, Juris Compl. ¶¶ 36-72). All of these causes of action arose "by virtue of the Inamed/McGhan silicone breast implants in her body from the date of insertion until the date of removal and the residual silicone that has been deposited in her body and is currently present . . . ." (Doc. #217-5, Juris Compl. ¶ 29). Settled Claims, according to Order 47A, include, without limitation, "any and all claims of personal injury and/or bodily injury, damage, death, emotional or mental harm" as well as "any and all claims for alleged economic or other injury or loss or for statutory damages under any state statute." (Doc. #59, Order 47A ¶ 2(c)). If it proceeds in California State Court, Juris's litigation would necessarily require relitigation of claims dismissed with prejudice by Order 47A. Accordingly, as *Battle*, *Wesch*, and *Burr & Forman* authorize an anti-suit injunction in exactly this situation, Juris's request to dissolve the injunction over Defendants' objection would be improper. Therefore, to the extent that Juris has requested dissolution of Order 47A's anti-suit injunction, her request is due to be denied.

## IV.    CONCLUSION

First, Defendants' Motion for Order to Show Cause is due to granted in part and denied in part. To the extent that Defendants have argued for continued enforcement of Order 47A's anti-suit injunction against Juris, their request is due to be granted, but to the extent that they have requested contempt proceedings, their request is due to be denied. They have not made the requisite showings

at this juncture to warrant formal contempt proceedings.  Second, Juris's constructive Rule 60(b)

motion is due to be denied.  A separate order, consistent with this Memorandum Opinion, will be

entered contemporaneously herewith.

      **DONE** and **ORDERED** this _____19th_____ day of May, 2010.

              **R. DAVID PROCTOR**
              UNITED STATES DISTRICT JUDGE